Wallace E. LUNNING, individually, and
W.T.S., Inc., Appellants,

v.

LAND O'LAKES, Respondent.

No. 50568.

Supreme Court of Minnesota.

Dec. 26, 1980.

Christian, Slen, Savelkoul, Johnson & Broberg, Henry J. Savelkoul, and Phillip A. Kohl, Albert Lea, for appellants.

Doherty, Rumble & Butler and George L. May, St. Paul, for respondent.

AMDAHL, Justice.

This is an appeal from an order of the district court, Third Judicial District, granting defendant judgment notwithstanding the verdict, or in the alternative, a new trial on the issue of liability on the ground that the evidence viewed most favorably to the plaintiff entitled defendant to judgment as a matter of law.

The issue is whether the evidence was sufficient to create a jury question as to the existence of either promissory or equitable estoppel and thus take an oral contract not performable within one year, out of the statute of frauds. Minn.Stat. § 513.06 (1978).

An examination of the evidence, in the light most favorable to the plaintiff, leads us to the conclusion that the evidence of promissory or equitable estoppel was not sufficient to create a jury question and the judgment of the district court is, therefore, affirmed.

Plaintiff, Wallace Lunning, began a business relationship with defendant, Land O'Lakes, in 1960. Plaintiff worked for the defendant as the owner–operator of a truck used in hauling turkeys. In 1967, plaintiff and defendant entered into a written contract granting plaintiff exclusive rights to transport live turkeys to defendant's plant, located in Albert Lea, Minnesota. Pursuant to the terms of the contract, defendant compensated plaintiff at a rate based on the weight of the turkeys when delivered. If a truck was mistakenly dispatched to a farm where there were no turkeys to pick up, defendant compensated plaintiff at a rate based on mileage. In addition, defendant paid plaintiff an hourly wage for time spent repairing "batteries"—coops used in transporting live turkeys. This latter agreement, however, was not contained in the written contract.

The parties thereafter entered into a series of contracts, some for two years, some for three. The contracts were, except for rate changes, substantially identical. Plaintiff and defendant followed a regular procedure for putting their agreements into writing. First, the parties would negotiate an agreement; in particular, they would agree on the new rates. Next, the defendant would request a contract from its legal department in Minneapolis. The legal department would forward to defendant a prepared form that, but for the blanks left for the new rates, the plant location and the signatures of the parties, expressed all the terms that had been agreed upon by the parties. One contract term provided that either party could terminate the contract for cause, upon thirty days written notice to the opposing party. Though the record shows no direct evidence on this point, it appears that the parties did not renegotiate the terms of their agreements once the defendant had requested the prepared form.

One such contract was in force during the period from March 1974 to March 1976. During this time the events occurred which precipitated this law suit.

On September 15, 1975, the plaintiff sent the following letter to the defendant:

This letter is advising you of Termination of present contract between Land O'Lakes, Inc., and myself.

Paragraph No. 1 *Term*.

If nothing can be worked out our last day will be Friday October 17, 1975.

Sincerely,

Wallace E. Lunning

While plaintiff's letter did not specify causes for termination, he testified on direct examination that health problems were affecting his ability to carry out the contract and that the same problem made it necessary that he employ a manager at additional expense and that the price of diesel fuel was skyrocketing. He additionally testified:

I was going to get away from the turkey haul because it is a lot of stress and strain on a person. You're on duty 24 hours a day. I was going to put my trucking business into more grain business, more reaping business, and machinery.

Plaintiff's letter caused extreme concern to defendant because the fall months are the busiest of the year for the turkey busi-

ness. Mr. Barnes, the Production and Procurement Manager of the Albert Lea turkey division, testified at trial that he feared that if plaintiff went through with the termination, another transporter of turkeys could not be found to replace plaintiff; this would force a shut down of the plant and, with that, a layoff of approximately 350 employees. In the hope of forestalling a termination by plaintiff, defendant arranged meetings with him to discuss the September 15th letter.

The parties met twice, once on October 2, 1975, and once on October 16, 1975. There is dispute as to the parties present and the statements made at these meetings. However, there is little dispute over the substance of the negotiations. At the first meeting they went through the contract paragraph by paragraph and all agree that at one of the meetings the plaintiff explained that he had health problems and, as a result, wanted to shift some responsibilities to an assistant, Larry Hensche. Plaintiff also informed defendant that he had ordered some new trailers which were two feet longer than the old trailers and defendant stated they would add length to their turkey coops so they would fit the new trailers.[1] The parties also agree that, at one point, defendant asked the plaintiff what would happen if no contract was made. Plaintiff replied "I'll never leave you high and dry." While the plaintiff and Hensche testified that plaintiff made that statement in a businesslike and cordial manner, the defendant's evidence was to the contrary. Both witnesses for defendant testified that when plaintiff made this statement, his tone was sarcastic and he had a smirk on his face. In defendant's version, the conversation continued. Defendant then asked "What the hell are we supposed to do now? You got us over a barrel. What are we going to do if we don't have a contract by the 17th of October?" Plaintiff's response was "You got my letter."

Plaintiff made demands at the first meeting for an 8 percent increase in the rates and/or a fuel escalator clause, and for an increase in coop repair rates. At the second meeting, defendant counter-proposed a 5½ percent increase in the rates and a $3.00 per hour increase in coop repair rates. The plaintiff accepted the counter-proposal. Defendant then stated that it would request a form contract for the parties' signatures from the Minneapolis legal department. All parties agree that a new contract was formed on October 16, 1975, and that after that date the written contract was "dead." Plaintiff testified "We were agreeable on everything on the 16th of October." The parties thereafter operated under the oral contract, defendant paying plaintiff the higher rates.

A few days after the October 16th meeting, plaintiff met with his attorney to discuss changing the terms of the oral contract. The plaintiff did not notify defendant of this meeting.

Plaintiff and Hensche testified that they frequently questioned defendant about the whereabouts of the contract. They were repeatedly told "It's coming." On December 19, 1975, the contract did come from the Minneapolis legal department; it was the standard form contract the parties had been using for years. Defendant forwarded the contract to plaintiff who then took it to his attorney, again to discuss changing its terms. The plaintiff's attorney drafted a new contract, based on the form contract. The new contract expressed four changes: (1) the oral agreement covering the rate for coop repair was written into the contract; (2) a clause was added which provided that the plaintiff was not obligated to pick up turkeys when road or weather conditions made it unsafe to do so; (3) a clause was added which provided that the contract could be assigned to Larry Hensche upon 30

---

1. In July of 1975, during the term of the written contract of March 1974, plaintiff ordered, but had no immediate obligation to purchase, 11 new trailers. On September 8, 1975 he conferred with the trailer sales company and testi-fied that he was "maybe" committed to take the trailers. On October 6, 1975, he took delivery on 5 of the new trailers. On November 6, 1975, he accepted delivery of the remaining 6 trailers.

days notice; (4) the strike clause was amended to provide guaranteed payments to Lunning after the plant was closed five consecutive days by strike instead of ten consecutive days previously agreed to. The plaintiff sent the new contract to defendant in mid–January.

On or about January 30, 1976, the plaintiff called defendant to check the status of the new contract; Larry Hensche, with plaintiff's consent, eavesdropped on the conversation. The parties agree that during this conversation the defendant stated that the new contract was unacceptable. They further agree that defendant stated that, as a result, there would be no contract, but that plaintiff could continue to haul turkeys for defendant until June or July of 1976. The plaintiff and defendant disagree whether defendant stated that it did not recognize plaintiff's September 15th letter of termination. Plaintiff asserts the statement was made; defendant denies it.

Sometime in December 1975, the defendant ordered the preparation of a study to determine the feasibility of defendant hauling its own turkeys rather than contracting the job to outside truckers. The conclusion of the study was that defendant could save $182,000 annually by hauling its own turkeys. After the January 30th conversation with plaintiff, defendant acted on the study's result and requested authority to purchase the equipment necessary for it to do the hauling.

On February 3rd, plaintiff, after discussion with John R. Peterson, his attorney, sent the following letter to the defendant:

Mr. Keith Barnes

This is to notify Land O'Lakes, Inc. of Albert Lea, Minn. that of (sic) March 15th, 1976 is our last day of work.

Turkey Coops to be removed from all trailers March 16th.

Enclosed find cancellation of all insurance with regard to Land O'Lakes, Inc. of Albert Lea, Minn.

Respectfully,
WTS Inc.
/s/ Wallace E. Lunning
President

On February 10 plaintiff sent another letter to defendant and included his check for the difference between the higher rates paid him under the oral contract and the rates under the terminated written contract. That letter advised defendant "not to burden John R. Peterson in regards to any of our last telephone calls or negotiations." Defendant returned the check to plaintiff.

Plaintiff then consulted with a different attorney, who, with plaintiff's help, drafted the following letter under date of February 14, which was sent to the defendant: [2]

Dear Mr. Barnes:

This letter is to make clear my correspondence of February 3, 1976, and to inform you of our new insurance.

After March 15, 1976, certificates of insurance will be issued to Land O'Lakes, Inc. of Albert Lea, Minnesota through and by Town and Country Insurance Agency with the Company Greatwestern.

This letter is also to inform you that the notice of February 3, relates to the terms of our rates in effect and our previous contract which was to run until March 15, 1976.

In all other terms our contract now existing is affirmed, we will continue under the terms as per our agreement, made October 16 and 17th, 1975.

---

**2.** The statement in the letter of February 14 that the notice of February 3 relates to the prior, i. e., March 1974 to March 1976, contract which was considered "dead" by each of the parties in October of 1975, and that the agreement of October 16 and 17, 1975, is to continue, is difficult, if not impossible to reconcile with the language of the February 3 notice. The latter is unqualified notice of termination of plaintiff's work for defendant as of March 15, 1976. First it declared it to be the last day of work; second, it ordered removal of defendant's turkey coops from the plaintiff's trailers on March 17 and the turkey hauling could not be performed without such coops; and thirdly, all insurance protecting defendant was cancelled and it is inconceivable that defendant would permit the hauling to continue without insurance protection.

We will look forward to a continued and productive relationship in the future as heretofore existing in the past period.

Kindest personal regards.

Very truly yours,

Wallace Lunning

The record discloses no further communications between the parties. March 15, 1976 was the last day plaintiff hauled turkeys for the defendant. Plaintiff thereafter brought suit against defendant for damages suffered as a result of defendant's alleged breach of the oral contract. Defendant's answer asserted the statute of frauds, Minn.Stat. § 513.01(1), as a defense and defendant counterclaimed for plaintiff's alleged breach of the written contract.

EQUITABLE ESTOPPEL

■ We have previously recognized that the doctrine of equitable estoppel may limit the application of the Statute of Frauds. *Roberts v. Friedell*, 218 Minn. 88, 15 N.W.2d 496 (1944). The legislature enacted the Statute to promote honesty and fair dealings; to prevent fraud. *See Alamoe Realty Co. v. Mutual Trust Life Ins. Co.*, 202 Minn. 457, 278 N.W. 902 (1938). When an application of the Statute will protect, rather than prevent, a fraud, equity requires that the doctrine of equitable estoppel be applied. The following conditions, however, must first be met.

1. There must be conduct—acts, language or silence—amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, *and at the time when it was acted upon by him.* 4. The conduct must be done with the intention, or at least with the *expectation*, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. * * * 5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse, in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it.

3 J. Pomeroy, A Treatise on Equity Jurisprudence § 805 (5th ed. 1941).

■ Whether equitable estoppel is properly applied in this case turns on whether one of those conditions has been met; did the defendant make a representation or concealment of material fact? Plaintiff first attempts to show that the condition need not be met for, in his view, representation or concealment of a material fact is no longer an essential element of equitable estoppel. In the alternative, plaintiff argues that both a representation of material fact and a concealment of material fact occurred in this case.

Plaintiff reads our opinion in *Sacred Heart Farmers Cooperative Elevator v. Johnson*, 305 Minn. 324, 232 N.W.2d 921 (1975) to assert that the requirement of representation or concealment of material fact is dispensable. He creates that reading by narrowly focusing on our citation of *Oxley v. Ralston Purina*, 349 F.2d 328 (6th Cir. 1965), given in a discussion of detrimental reliance. 305 Minn. at 328, 232 N.W.2d at 923. Plaintiff argues that *Oxley* stands for the proposition that a representation or concealment of material fact is not an essential element of equitable estoppel. Our citation of that case, in his view, evidences an implied acceptance of that proposition. Plaintiff's argument is without merit for two reasons. First, we do not read *Oxley* to state that a representation or concealment is a dispensable element of equitable estoppel. Second, any question of implied acceptance of that proposition raised by our citation of *Oxley*, was answered in our holding in *Sacred Heart*, where we stated that the application of equitable estoppel was inappropriate because there was no repre-

sentation or concealment of material fact. Moreover, any doubts remaining as to the stance of this court were put to rest in our opinion in *W. H. Barber Company v. McNamara Vivant Contracting Company, Inc.*, 293 N.W.2d 351 (Minn.1979). There we stated that a "representation or concealment of material fact is an indispensable element of equitable estoppel." 293 N.W.2d at 357. We abide by those decisions.

In the alternative, the plaintiff first argues that the defendant did make a representation of material fact. The representation occurred in defendant's repeated statements, over a two month period, that the contract was coming, that it was being sent from the Minneapolis Legal Department. Plaintiff reads the statement "It's coming" as a guarantee that the contract form had been placed in the mails at the time the statement was made. The evidence indicates that, in all likelihood, it had not. It is, therefore, reasonable to assume that if the statement was a guarantee it was broken when made. We do not quarrel with plaintiff's characterization of the statement as a representation. We do take issue with the designation of it as material.

A fact is material if it is germane to the unconscionable conduct alleged and works a prejudice to the party. *See Rien v. Cooper*, 211 Minn. 517, 1 N.W.2d 847 (1941). Plaintiff has made no showing that this statement prejudiced him in any way; neither are we convinced that the statement is germane. We are, therefore, unwilling to premise an application of equitable estoppel on that representation.

Plaintiff's second argument, in the alternative, is that defendant should be estopped from raising the Statute of Frauds as a defense because it concealed a material fact, the ordering of a feasibility study. The defendant does not deny that it ordered a study to determine the feasibility of hauling its own turkeys or that the study showed a potential savings to defendant of $182,000 if it did its own hauling. Defendant does deny, however, that the ordering of the study is a material fact.

Plaintiff contends that the purpose of the study was to determine the feasibility of a breach of the oral contract. Plaintiff therefore asks us to conclude that defendant's actions, from the time defendant entered into the oral contract with plaintiff to the time of the alleged breach, were designed to hold the contract in abeyance until the completion of the feasibility study. Defendant's alleged plan was to wait until the close of the busy turkey season to breach the contract, if the study showed the breach to be profitable. Plaintiff argues that with this view of the facts, the ordering of the study was a material fact.

We decline to invoke the doctrine of equitable estoppel on so thin a showing of materiality. The plaintiff's argument depends on our accepting his conclusion that the purpose of the feasibility study was to determine the feasibility of a breach of the oral contract. Yet, the purpose of the study, so central to plaintiff's case, was not tried below. The study was not offered into evidence. The plaintiff proffered no explanation or description of the study, other than the potential for savings it showed. In short, no evidence was offered to support the plaintiff's characterization of the study's purpose. The only description of the study came from the defendant, who characterized it as a planning tool for the future, a contingency plan.

We are unwilling to hold that the mere ordering of a feasibility study evinces an intent to breach a present contract. Businessmen often order studies to determine the feasibility of a future course of action. This is the first step toward reaching any number of possible goals: obtaining a loan; floating a public bond; initiating a new contract; breaching a present contract. Plaintiff would have us hold that ordering a feasibility study is proof positive that the fourth goal, a breach, is necessarily the one a party intends to reach. We decline to so hold. We prefer, instead, to recognize that the ordering of such a study is but the first step taken when following any of several courses of action. Additional evidence is required to show which course is chosen.

On the record before us we can do no more than say defendant took the first step; we cannot state his direction.

We can reach the same result by taking a different route. When determining the applicability of the doctrine of equitable estoppel, our inquiry does not end with the finding of a representation or concealment of a material fact. The other conditions set out by Pomeroy must also be met. Among those is reliance.

■ Plaintiff must show that he relied on the representation or concealment, and that he acted upon it. Plaintiff can make no such showing here. To do this, plaintiff would have show that he entered into the contract with defendant in reliance on the representation made by defendant or without knowledge of defendant's concealment of material fact. However, in this case, neither the representation nor the concealment alleged occurred *prior* to the making of the contract. For that reason, the plaintiff can not show that he relied on either when making the contract; without this showing, the doctrine of equitable estoppel cannot be invoked. *See Barber*, 293 N.W.2d at 357.

## PROMISSORY ESTOPPEL

■ Plaintiff argues that, if the application of equitable estoppel is inappropriate, the doctrine of promissory estoppel should be used to take this contract out of the Statute of Frauds. We acknowledged in *Del Hayes & Sons, Inc. v. Mitchell*, 304 Minn. 275, 230 N.W.2d 588 (1975), that there are currently two views of promissory estoppel, one restrictive, one expansive. In the restrictive view, promissory estoppel implies a contract in law where none exists in fact. *See Sacred Heart*. The expansive view takes a contract out of the Statute when the promise relied upon is a promise to reduce the contract to writing. Under the facts before us we need not determine which view of promissory estoppel is the better; neither view will save this contract.

The restrictive view is not applicable in this case. There is no need to imply a contract here for both parties agree that a contract did exist. Only the expansive view can make this contract enforceable. Plaintiff did rely on defendant's promise to reduce the contract to writing. However, the facts demonstrate that defendant kept that promise.

Plaintiff bases its promissory estoppel argument on the defendant's tender of an incomplete contract to the plaintiff. The contract delivered to plaintiff was the normal form contract used by the parties, completely drafted but for spaces left for the hauling rates and the location of the turkey plant. Plaintiff argues that defendant's forwarding of the contract to plaintiff without first filling in the blanks evidences a refusal to reduce the contract to writing. We do not agree.

Here, there is no claim that the parties in their past practice used only contracts that had been completely filled in prior to the receipt by plaintiff. To the contrary, the evidence introduced at trial shows that their normal course and practice was to leave the blanks open until the parties met to sign the contract. Then, the previously negotiated and agreed upon rates and the plant location were entered and the contract signed. Defendant did nothing other than comply with the parties' normal course of dealing. We are unwilling to equate compliance with refusal. Moreover, the evidence offered at trial showed that up to the time it learned that plaintiff had unilaterally added new provisions to the negotiated and agreed upon contract terms, defendant was ready and willing to sign the contract. Plaintiff never requested that defendant sign that contract.

## DEFENDANT'S COUNTERCLAIM

■ The trial court acted properly when it dismissed defendant's counterclaim for plaintiff's alleged breach of the written contract. Defendant relied solely on the plaintiff's September 15th letter of termination to prove the breach. This alone is insufficient. The written contract clearly provided each party with the right to terminate the contract for cause, upon thirty days written notice. Defendant never

questioned the validity of the cause which prompted plaintiff to terminate the contract. Instead, defendant renegotiated the contract to accommodate plaintiff's demands. The more likely interpretation of these facts is that the contract was not breached by plaintiff, but rather it was mutually rescinded by the parties at the October 16th meeting. *See Minnesota Ltd., Inc. v. Public Utilities Commission of Hibbing,* 296 Minn. 316, 208 N.W.2d 284 (1973).

The defendant alleges that the contract should be found void because it entered into the contract under duress. Defendant, however, did not establish a case of duress at trial. Defendant offered no evidence that plaintiff's letter of termination left it with no open course but renegotiation. "The mere threat to withhold from a party a legal right, which he has an adequate remedy to enforce, is not, in the eye of the law, duress; certainly not such as will avoid the execution of a contract." *Cable v. Foley,* 45 Minn. 421, 422, 47 N.W. 1135, 1136 (1891). In the absence of proof that plaintiff's actions deprived defendant of all free will, *Wise v. Midtown Motors, Inc.,* 231 Minn. 46, 51, 42 N.W.2d 404, 407 (1950), we decline to transform an apprehension into duress.

The order and judgment of the district court are affirmed.