**STARRY CONSTRUCTION CO., INC., a Minnesota corporation, Plaintiff,**

v.

**MURPHY OIL USA, INC., a foreign corporation, Defendant.**

**Civ. No. 4–90–767.**

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 27, 1992.

Kyle E. Hart, Marvin T. Fabyanske, Fabyanske, Svoboda, Westra & Davis, St. Paul, Minn., for plaintiff.

Lawrence T. Hofmann, Terese S. Wallschlaeger, Zelle & Larson, Minneapolis, Minn., David L. Doyle, Joseph A. Strubbe, Pope & John, Chicago, Ill., for defendant.

## ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant's motion for summary judgment and on plaintiff's motion for summary judgment as to defendant's commercial impracticability defense. Defendant's motion will be granted.

FACTS

This case, arising in the context of the highway construction industry, involves the purported modification to a contract for the sale of asphalt cement oil. Plaintiff Starry Construction Co. (Starry) is a general contractor engaged in the business of asphalt road construction. Defendant Murphy Oil USA, Inc. (Murphy) is a supplier of asphalt cement oil, one of the materials required for installing asphalt pavement.

In March 1990, Robert Billingsley, one of Murphy's sales managers, orally agreed to sell Starry 20,000 tons of asphalt cement oil for $90 per ton, excluding taxes. Aff. of Steven Minnerath ¶ 8. Murphy sent Steven Minnerath, Starry's president, a sales acknowledgment form dated April 12, 1990. *See* Pl.'s Mem. in Opp'n to Summ. J., Ex. A. That form by its terms confirms the quantity and price of Starry's order, but also contains in particular the following clauses:

Fire, flood, strikes, differences with workmen, accidents to plants or machinery, failure of or unusual conditions surrounding the usual source of supplies of material, or other causes beyond the control of either party shall be a sufficient excuse for any delay or failure upon the part of either party to perform this or-

der, provided, however, that such party shall notify the other with reasonable promptness as to the existence of such cause.

If, by reason of any said causes, Murphy is unable to make deliveries to all its customers (whether under contract or not) its failure in whole or in part to make deliveries to purchaser, while delivering to others, shall not be a breach of this agreement and in such event Murphy may, but shall not be obligated to, prorate its available supply.

Pl.'s Mem. in Opp'n to Summ. J., Ex. A.

Starry acknowledges receiving the form, but neither signed nor returned it to Murphy. Minnerath Aff. ¶ 10. According to Minnerath, the form included additional terms that were not a part of the oral agreement. Instead, Minnerath proceeded to bid work for Starry, allegedly under the assumption that Starry and Murphy had a valid oral contract which was limited to the terms specifically agreed upon. *Id.*

Toward the end of April, Minnerath determined that Starry would need more oil. He contacted Billingsley and requested an additional 5,000 tons. Billingsley said that he would "check on it" and inform Starry in a day or so. Minnerath Aff. ¶ 4. Murphy did not contact Starry. Several days later, Minnerath called Billingsley, who allegedly indicated that Murphy would sell the additional oil on the same terms and conditions as those initially agreed to. Minnerath Aff. ¶ 5. Although Starry allegedly obtained additional work based on the increased figures, *see* Minnerath Aff. ¶ 11; Pl.'s Mem. in Opp'n to Summ. J., Ex. B, Minnerath neglected to send a confirmatory memorandum of this oral modification. Pl.'s Mem. in Opp'n to Summ. J. at 6–7; Minnerath Aff. ¶ 15.

During the spring and summer of 1990, Minnerath periodically communicated with Billingsley regarding the delivery of asphalt cement oil. Minnerath Aff. ¶ 16. Minnerath allegedly told Billingsley that Starry had obtained enough work to use all of the asphalt cement oil, including the additional 5,000 tons, that Murphy had agreed to provide. Minnerath Aff. ¶ 16.

Minnerath claims that Billingsley never contested the quantity under the contract in their discussions. Minnerath Aff. ¶ 16.

In August of 1990, Iraq invaded Kuwait. Members of the media reported that prices for all oil-based products were likely to rise substantially. During September 1990, approximately one month before the end of the 1990 paving season, Murphy began experiencing an unprecedented demand for asphalt cement oil. Def.'s Mem. in Opp'n to Summ. J., Ex. B at 14. (Dep. of Maurice Peel). Essentially, Murphy's customers began requesting the full amount of oil under their contracts after the War in the Persian Gulf began, while historically they requested only ninety to ninety-five percent of those amounts. Peel Dep. at 14, 21–22, 32–33, 88.

Tom O'Brien, Starry's comptroller, became concerned that Murphy would not supply the additional oil. He asked Minnerath to call Billingsley and obtain a written confirmation of the modification. Minnerath Aff. ¶ 17. Minnerath did so. Billingsley allegedly responded, "Don't worry about it. I'll take care of you. I've never cheated you in the past. You are a good customer, and I treat our good customers right." Minnerath Aff. ¶ 18.

Later, Minnerath learned that Murphy was promoting Robert Billingsley and would be replacing him with Michael Palmgren. Minnerath allegedly called Billingsley once again and suggested the need to let his successor know about the agreement for 25,000 tons. Minnerath Aff. ¶ 19. Minnerath claims that Billingsley told him that he would leave a note on Palmgren's desk. Although Minnerath claims that after replacing Billingsley Palmgren acknowledged that he had seen such a note, *see* Minnerath Aff. ¶ 22, Palmgren does not remember one. *See* Dep. of Michael Palmgren at 80.

In September 1990, Palmgren informed Starry that because of an oil crisis Murphy would be forced to allocate its supply. Consequently, Starry would not be receiving the additional 5,000 tons of oil, although Murphy did eventually supply an additional 107 tons. Minnerath Aff. ¶ 24.

Believing that Murphy would inevitably provide the full 5,000 tons requested, Starry did not approach other suppliers to cover the shortfall until September 24, 1990. At that time Starry agreed to purchase 1,000 tons of oil from Richards Asphalt Company for $117 per ton. *See* Pl.'s Mem. in Opp'n to Summ. J., Ex. D. In addition, Starry agreed to purchase another 3,000 tons from the Ashland Petroleum Company at $130 per ton on September 30, 1990. *See* Pl.'s Mem. in Opp'n to Summ. J., Ex. D.

On October 5, 1990, Minnerath, on advice of counsel, *see* Def.'s Reply, Ex. A at 119–20 (Dep. of Steven Minnerath), sent Palmgren a letter. Pl.'s Mem. in Opp'n to Summ. J., Ex. E. That letter contains the following paragraph:

> When we met on September 27, 1990, you indicated that you would get back to us with some kind of a schedule of the amount and timing for the ... [asphalt cement oil] you would give us so that we could, in turn, schedule our hot mix plants and make arrangements to purchase oil elsewhere if you would not supply us with the 25,000 ton called for by our Agreement.

*Id.* The letter further provides:

> We now understand that you intend to provide us with approximately 54 ton of oil per day, but won't guarantee its availability.

*Id.*

Murphy now denies that the agreement was ever modified to include an additional 5,000 tons of oil. Starry commenced this action against Murphy and asserted claims for breach of contract, equitable estoppel, promissory estoppel, and negligent misrepresentation. Murphy answered, alleging as its fourth affirmative defense that performance of the contract was commercially impracticable. Answer at 2. Murphy now moves the Court for summary judgment and Starry moves for summary judgment as to Murphy's commercial impracticability defense.

DISCUSSION

■ A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of the court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

I. Murphy's Motion for Summary Judgment

Murphy moves for summary judgment on all four counts of Starry's second amended complaint. As noted above, the second amended complaint asserts four separate claims: 1) modification of an oral agreement; 2) promissory estoppel; 3) equitable estoppel; and 4) negligent misrepresentation.

### A. Whether the Statute of Frauds Precludes Starry From Claiming an Oral Modification of the Contract for Sale of 20,000 Tons of Asphalt Cement Oil

■ Murphy's first argument is that the statute of frauds bars Starry's claim for breach of an oral contract. As a general rule, a contract for the sale of goods for the price of $500 or more is not enforceable unless there is some writing sufficient to indicate that a contract has been made between the parties. *See* Minn.Stat. § 336.2–201. The only term which must appear is the quantity term, which need not be accurately stated although recovery is limited to the amount stated in the writing. *See* Minn.Stat. § 336.2–201, Uniform Commercial Code comment 1. Murphy bears the burden of establishing a statute of frauds defense. *See Frank Adams & Co. v. Baker*, 1 Ohio App.3d 137, 1 OBR 444, 439 N.E.2d 953, 954 (1981). The determination of whether the statute has been satisfied is generally a question of law. *See, e.g., Jerry Harmon Motors, Inc. v. First Nat'l Bank & Trust Co.*, 472 N.W.2d 748, 753 (N.D.1991); *Sanchez v. Martinez*, 99 N.M. 66, 69, 653 P.2d 897, 900 (Ct.App.1982).

■ Proper analysis of questions under the statute of frauds involves a three-part inquiry. The first question is whether the statute of frauds applies. If so, the next question is whether the statute has been satisfied. If not, the third question is whether some exception to the statute renders the oral contract enforceable. If this final question is answered in the negative, then the oral contract is not enforceable.

#### 1. Whether the Statute of Frauds Applies

■ The parties do not contest that the statute applies to the purported oral modification of their contract. The contract as formed required Murphy to supply 20,000 tons of asphalt cement oil at approximately $90 per ton. The purported oral modification increased that amount to 25,000 tons. According to Minn.Stat. § 336.2–209(3), the requirements of the statute of frauds must be satisfied if the contract as modified is within its provisions. Here the contract as modified was for the sale of goods for the price of at least $2,250,000, well over the required $500. Thus, the statute applies.

#### 2. Whether the Statute Has Been Satisfied

■ The next question is the statute of frauds has been satisfied. Generally, the statute can be satisfied in two different ways. The requirements of the statute are first met where an oral agreement is evidenced by a writing containing a quantity term which is signed by the person against whom enforcement is sought. *See* Minn. Stat. § 336.2–201. A second method of satisfying the statute applies to merchants only. A merchant is a "person who deals in goods of the kind or otherwise by occupation holds out as having knowledge or skill peculiar to the practices or goods involved in the transaction...." Minn.Stat. § 336.2–104(1). In sales transactions involving merchants the statute is satisfied if "within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents," unless written notice of objection to its contents is given within ten days of receipt. Minn.Stat. § 336.2–201. Although this is really just another method of satisfying the statute, this method is sometimes referred to as the "merchant exception." *See M.K. Metals, Inc. v. Container Recovery Corp.*, 645 F.2d 583, 591 (8th Cir.1981); *Apex Oil Co. v. Vanguard Oil & Serv. Co.*, 760 F.2d 417, 423 (2d Cir.1985).

##### a. Merchant Exception

Murphy argues that the statute has not been satisfied through either method. Starry claims that the parties orally agreed to modify their contract. *See* Minnerath Aff. ¶ 5. According to Murphy, no writing memorializes any oral modification so that the statute is not satisfied under the first method. In addition, Murphy contends that the merchant exception does not satisfy the statute. Although the parties do not contest that they are merchants, the only writing relating to the agreement of the

parties is the Sales Acknowledgement form. That form provides for a contract involving the sale of only 20,000 tons of asphalt cement oil. *See* Pl.'s Mem. in Opp'n to Summ. J., Ex. A. Murphy claims that there is no indication anywhere in the record that Starry sent Murphy written notice of objection to the form's terms. *See* Def.'s Mem. in Supp. of Summ. J., Ex. B at 34 (Minnerath Dep.). Because Starry cannot present a writing memorializing a modification, and because it allegedly has failed to satisfy the requirements of the merchant exception, Murphy contends that Starry's breach of oral contract claim is barred by the statute of frauds.

In response, Starry claims that it has in fact satisfied the merchant exception. According to Starry, section 336.2–201(2) is satisfied if within a reasonable time after the oral contract was made Starry sent a writing confirming the contract. Starry claims that Minnerath's letter of October 5, 1990 constitutes such a writing. Pl.'s Mem. in Opp'n to Summ. J., Ex. E. That letter allegedly identifies the subject matter of the contract, and also reflects a quantity term of 25,000 tons. Further, Starry claims that the October 5, 1990 letter was sent within a reasonable time after the oral agreement was formed in the end of April 1990. Minnerath and Billingsley allegedly had built a history of trust upon verbal dealings such that written confirmation of agreements was not needed; there was therefore no reason why Minnerath would have needed to confirm the oral modification. In addition, during September of 1990, Murphy still sold Starry an additional 107 tons of asphalt cement oil. Only after Murphy allegedly refused to perform the contract was there a reason for the written confirmation, which Minnerath allegedly supplied promptly thereafter. *See Tipton v. Woodbury,* 616 F.2d 170, 176 (5th Cir. 1980) (per curiam). Given these circumstances, Starry contends that the six-month delay in sending the letter was reasonable. Regardless, whether the letter was in fact sent within a reasonable time is, according to Starry, a question of fact for a jury to decide. *See Azevedo v. Minister,* 86 Nev. 576, 471 P.2d 661, 666 (1970).

Murphy responds in its reply that the October 5, 1990 letter is not a writing in confirmation of a contract sufficient to satisfy the statute of frauds for two reasons. First, Murphy claims that the letter was not sent within a reasonable time as a matter of law. In this case, Starry sent the letter nearly six months after formulation of the alleged oral agreement, and then only after Murphy denied the existence of any modification. During those months, the price of asphalt cement oil rose nearly 150 percent. Minnerath Aff. ¶ 27. Murphy had also refused to provide the requested confirmation in August. Def.'s Reply, Ex. A at 58 (Minnerath Dep.). Iraq invaded Kuwait in August, causing additional instability in the market. For all of these reasons, Starry's neglect in sending the letter should be deemed unreasonable as a matter of law.

In addition, Murphy contends that the October 5, 1990 letter was not a writing "in confirmation of a contract" as required by section 336.2–201(2). First, the letter on its face does not confirm an agreement, but rather recognizes disagreement in that Murphy refuses to provide the additional oil. Second, it was only after Starry consulted with counsel that the letter was sent purporting to confirm the oral modification. Def.'s Reply, Ex. A. at 119–120. Because the letter was not sent in the ordinary course of business, Murphy argues that it could not confirm a contract within the meaning of section 336.2–201(2). Consequently, Murphy was allegedly under no duty to respond to the letter.

■ This question thus boils down to whether the October 1990 letter satisfies the merchant exception. Although there is apparently no requirement that a letter confirming a contract be sent in the ordinary course of business, or that it take a particular form, the Court finds that under these circumstances a six-month delay in the sending of the letter was unreasonable as a matter of law. First, Starry candidly acknowledges that it has been able to find no case in which a period of more than four months was held to be reasonable under the merchant exception. The inordinate

length of time alone in this case justifies holding the delay unreasonable. Moreover, the circumstances surrounding the relationship of the parties make a six-month delay unreasonable. The Uniform Commercial Code provides that "[w]hat is reasonable time for taking any action depends on the nature, purpose and circumstances of such action." Minn.Stat. § 336.1–204(1). In this case, a writing in confirmation of the oral modification would lock the parties into a modified supply contract at a particular price. The volatility of the petroleum market, the radical fluctuations in price and supply, all counsel in favor of prompt confirmation.

Starry's reliance on *Tipton* is misplaced. The plaintiffs in *Tipton* claimed that on January 25, 1977 the parties, both merchants, entered into an oral contract for the purchase of all of defendant's stock so as to give plaintiff a controlling interest in a Florida bank. On April 15, 1977, a meeting between the parties went sour. By the end of the meeting the defendant denied the existence of a sales contract. Three days later one of the plaintiffs sent a letter to the defendant, the express purpose of which was to confirm the purchase of 22,-300 shares of stock for $20.50 per share. Defendant never responded to the letter. The court of appeals concluded that the letter satisfied the merchant exception of the statute of frauds. The court reasoned that nothing was put in writing at the time of formation because the defendant implied that it was not proper to do so. 616 F.2d at 175. Consequently, there was no reason for the plaintiffs to need to send a letter between January and April of 1977. Only when the defendant changed the rules did the plaintiffs respond so as to preserve their version of the original agreement. Because the plaintiffs acted in good faith at all times, the court concluded that the letters were sent within a reasonable time. *Id.* at 176.

This case, as noted by the defendant, differs substantially from *Tipton*. Starry does not claim that Murphy ever indicated that reducing the oral agreement to writing was improper. In addition, the rules in this case changed in August 1990, when Iraq invaded Kuwait. Such an inflammatory circumstance was the harbinger of increased demand; Starry should have recognized the need then to secure its supply. In further contrast, Starry waited about three weeks after express denials by Murphy to send the October 5, 1990 letter. *Tipton* is thus factually distinguishable from the case at bar.

In any event, Starry could have protected itself. All it needed to do was to send a letter confirming the modification; Murphy did not even need to sign it. Minnerath candidly acknowledges that he simply neglected to send one. Minnerath Aff. ¶ 15. Moreover, Murphy's repeated refusal to provide confirmation should have indicated to Starry that Murphy did not acknowledge the existence of the modification. Thus, the Court concludes that the merchant exception is not satisfied by the October 5, 1990 letter.

#### b. *Evidence of a Writing*

Starry also argues that the statute is satisfied because there is evidence of a writing as required under section 336.2–201(1). Starry correctly argues that as long as a quantity term is included, the form of the writing is unimportant. It "may be written in lead pencil on a scratch pad...." Minn.Stat. § 336.2–201, Uniform Commercial Code comment 1; *see Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1034 (5th Cir.1982). In this case, Starry claims that a written note which Robert Billingsley left for Michael Palmgren, stating that Murphy had agreed to provide the additional 5,000 tons of asphalt cement oil, constitutes a writing within the meaning of the statute. According to Starry, Billingsley told Minnerath that he would leave his successor a note to let Palmgren know about their modification. Minnerath Aff. ¶ 20. During September of 1990, Minnerath spoke to Palmgren about that note. Palmgren allegedly confirmed that the note had been made. Minnerath Aff. ¶ 22. Later, when Starry took his deposition, Palmgren testified that he did not remember seeing such a note. Dep. of Michael Palmgren at 80. Because Starry was one of

Murphy's larger customers, Palmgren was new on the job, and because of this lawsuit, Starry claims that Palmgren should have remembered the note, and was therefore being less than candid at his deposition. Starry suggests that a jury could easily infer from Palmgren's refusal to flat-out deny the note's existence and unlikely loss of memory about it that the note did in fact exist. Such a note, according to Starry, constitutes a writing sufficient to satisfy the statute of frauds.

Murphy responds that Starry is attempting to transform Palmgren's inability to remember a particular note into a writing sufficient to satisfy the statute. According to Murphy, the only evidence of the existence of this note is the testimony of Steven Minnerath, Starry's president. Robert Billingsley denies ever making such a note. Def.'s Mem. in Supp. of Summ. J., Ex. C at 54 (Billingsley Dep.). Palmgren does not remember seeing such a note. Murphy claims that the testimony of the plaintiff, the proponent of the alleged oral contract, should be insufficient to satisfy the statute.

To accept Starry's argument, the Court would have to rely solely upon the testimony of the proponent of the contract. This "is exactly what the statute of frauds seeks to avoid." *Joseph E. Seagram & Sons, Inc. v. Shaffer*, 310 F.2d 668, 675 (10th Cir.1962), *cert. denied*, 373 U.S. 948, 83 S.Ct. 1678, 10 L.Ed.2d 704 (1963); *see Weinsier v. Soffer*, 358 So.2d 61, 63 (Fla. Dist.Ct.App.), *cert. denied*, 365 So.2d 714 (Fla.1978). The oral testimony of the plaintiff does not constitute a writing sufficient to satisfy the statute of frauds. Further, even if the Court were to accept Starry's argument that there was such a note, there is no evidence that the note contained the requisite quantity term. This alleged note therefore does not satisfy the statute.

### 3. Whether an Exception to the Statute of Frauds Makes an Oral Modification Enforceable

#### a. *Admissions Exception*

■ The final question in the statute of frauds analysis is whether some exception to the statute applies, making the alleged oral modification enforceable. Starry re-

lies upon two. The first exception is contained in section 336.2–201(3)(b):

> (3) A contract which does not satisfy the requirements of subsection (1) [of section 2–201] but which is valid in other respects is enforceable

> . . . . .

> (b) if the party against whom enforcement is sought admits in pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted. . . .

Minn.Stat. § 336.2–201(3)(b). A party against whom enforcement is sought need not actually admit that there was a contract; he only need admit the facts the legal consequence of which is a contract in order to be deprived of the statute of frauds defense. *See Quaney v. Tobyne*, 236 Kan. 201, 689 P.2d 844, 850 (1984).

Starry claims that three admissions by Murphy in its testimony and pleadings satisfy the statute. First, in its memorandum in support of its motion, Murphy admits having supplied Starry with an additional 107 tons of asphalt cement oil. *See* Def.'s Mem. in Supp. of Summ. J. at 5. Starry suggests that the significance of this is that distributing a product to customers without contracts, after beginning an allocation program, could allegedly invalidate that program. The fact that Murphy supplied the additional oil therefore constitutes an admission that Murphy believed it had a contractual obligation to supply the additional 5,000 tons. Second, Starry claims that Billingsley's acknowledgement that the additional oil was discussed during March of 1990, combined with the evidence that Starry had received enough work to be able to use the additional amount, establishes the plausibility of Starry's claim and satisfies the purposes underlying the statute of frauds. Finally, Starry argues that an adverse credibility determination may amount to an admission. *See* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 3–9, at 177 (3d ed. 1988). According to Starry, Palmgren's

unlikely loss of memory regarding the existence of the note satisfies the admission exception.

Murphy first responds that the delivery of 107 tons of oil does not amount to an admission of a contract for 5,000 tons. Next, Murphy claims that the fact that the parties discussed the sale of an additional 5,000 tons of oil is innocuous; admission of an offer is not the same as an admission of a contract. Finally, Murphy contends that credibility determinations are not admissions. *See Cox v. Cox*, 292 Ala. 106, 289 So.2d 609, 612 (1974). Notwithstanding this, Murphy suggests that Palmgren's testimony is perfectly consistent with Billingsley's denial that such a note was ever made.

■ Starry's positions seem tenuous at best. There are at least two problems with respect to its argument that supplying 107 tons of oil constitutes an admission for statute of a contract for 5,000 tons. First, the Court cannot infer from the fact that Murphy supplied oil to Starry, a regular customer, that Murphy would not have done so without a contract because it would invalidate any allocation program. To the contrary, the statute expressly provides that the seller "may include [in its allocation program] regular customers not then under contract as well as his own requirements for further manufacture." Minn. Stat. § 336.2–615(b). The only requirement is that the allocation must be fair and reasonable. *Id.* Second, the admissions exception expressly provides that "the contract is not enforceable ... beyond the quantity of goods admitted...." Minn. Stat. § 336.2–201(3)(b). Assuming that there was an oral contract for an additional 5,000 tons of asphalt cement oil, that contract is enforceable only up to the 107 tons admitted.

■ Further, negotiations do not amount to a contract. *See Futch v. James River–Norwalk, Inc.*, 722 F.Supp. 1395,

1399 (S.D.Miss.1989), *aff'd mem.*, 887 F.2d 1085 (5th Cir.1989). In order to satisfy the admissions exception, a party must admit the facts giving rise to a contract. According to section 336.2–204, a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. Minn. Stat. § 336.2–204(1). The primary purpose of this section is to make explicit the proposition that sales contracts can arise even though some of the terms remain uncertain and the moment of their making is undetermined. *See Lemmer v. IDS Properties, Inc.*, 304 N.W.2d 864, 870 (Minn.1981); Minn.Stat. § 336.2–204(2), (3) (1990). Notwithstanding the flexibility of the Code, it is essential that the parties intend to enter into a binding agreement. Ronald Anderson, *Uniform Commercial Code* § 2–204:53, at 224 (3d ed. 1982). Although the fact that the sale of additional oil may render Starry's claim more plausible, the admissions exception has clearly not been satisfied.

■ Starry's third argument seems the least persuasive. Credibility determinations are inappropriate when reviewing motions for summary judgment. *AgriStor Leasing*, 826 F.2d at 734. Regardless, Murphy's employees have denied under oath that the contract was modified. The admissions exception does not apply when the party against whom enforcement is sought denies under oath the existence of a modification. *Cox*, 289 So.2d at 612.

### b. *Equitable Estoppel*[1]

■ The second exception to the statute of frauds relied upon by Starry is the equitable estoppel exception. The Uniform Commercial Code provides that unless specifically displaced by Code provisions, the principles of law and equity, including estoppel, supplement its provisions. Minn. Stat. § 336.1–103. Minnesota courts have long held that the doctrine of equitable

---

1. In its memorandum Starry argues that "promissory estoppel" takes the contract out of the statute of frauds. However, promissory estoppel has this effect only "when the promise relied upon is a promise to reduce the contract to writing." *Lunning v. Land O' Lakes*, 303 N.W.2d 452, 459 (Minn.1980). No such promise has been alleged. The Court therefore treats Starry's argument as setting forth a claim of equitable estoppel, not promissory estoppel.

estoppel may limit the application of the statute of frauds. *Del Hayes & Sons, Inc. v. Mitchell,* 304 Minn. 275, 230 N.W.2d 588, 593 (1975) (en banc); *Roberts v. Friedell,* 218 Minn. 88, 15 N.W.2d 496, 501 (1944). In the seminal case of *Lunning v. Land O' Lakes,* 303 N.W.2d 452 (Minn.1980), the Minnesota Supreme Court outlined the elements of equitable estoppel:

> 1. There must be conduct—acts, language or silence—amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him. 4. The conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon.... 5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse, in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it.

*Id.* at 457 (quoting 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 805 (5th ed. 1941)) (emphasis omitted). In short, there are essentially four elements: 1) misrepresentation of a material fact; 2) intent to induce reliance upon the misrepresentation; 3) actual reliance; and 4) damages.

Starry claims that its reliance upon the purported oral contract is in itself sufficient to satisfy the statute of frauds. Minnerath testified that Starry obtained additional work in reliance upon the belief that Murphy would supply additional oil. Minnerath Aff. ¶ 11. Starry has also produced documentary evidence of its reliance in the form of bidding records. Pl.'s Mem. in Opp'n to Summ. J., Exs. B, C. Furthermore, Starry contends that Minnerath must have had a good-faith basis for believing that Starry had an oral contract with Murphy otherwise he would not have waited so long to obtain desperately needed oil. Thus, Starry contends that reliance alone excepts their oral agreement from the statute of frauds.

Murphy responds that Starry has failed to produce any evidence that it misrepresented any material facts. Indeed, Murphy notes that Steve Minnerath admitted in his deposition that he has no reason to believe that Murphy did not intend to live up to whatever promises it made. Def.'s Mem. in Supp. of Summ. J., Ex. A at 127–28. In addition, there must be some evidence, according to Murphy, of unconscionable conduct to justify the application of equitable estoppel. Failure to perform an alleged oral agreement is allegedly insufficient to justify the application of estoppel.

 Without addressing whether a party seeking refuge under equitable estoppel must show unconscionability, it is clear that misrepresentation of a material fact is an indispensable element. *Lunning,* 303 N.W.2d at 457–58; *Barber v. McNamara–Vivant Contr. Co.,* 293 N.W.2d 351, 357 (Minn.1979); *Sacred Heart Farmers Coop. Elevator v. Johnson,* 305 Minn. 324, 232 N.W.2d 921, 923 (1975) (en banc). The parties seem to acknowledge that there is no evidence of misrepresentation, either intentional or unintentional. Thus, the equitable estoppel exception does not undermine Murphy's statute of frauds defense.

After analyzing the application of the statute of frauds under the three-part inquiry, the Court finds that the statute of frauds precludes Starry's claim of an oral modification beyond the 107 tons of additional oil. The statute of frauds clearly applies, given that the contract as purportedly modified involves the sale of goods for the price of $500 or more. The statute has not been satisfied, either through the merchant exception or the allegedly lost note.

Finally, the admission exception permits enforcement only for the additional 107 tons, while the estoppel exception does not apply at all. The Court will therefore grant Murphy's motion for summary judgment as to Count I of Starry's second amended complaint.

### B. Whether Murphy is Entitled to Summary Judgment as to Starry's Three Non–Contract Claims

#### 1. Promissory Estoppel[2]

In Count II of its second amended complaint, Starry claims that it is entitled to recover under the doctrine of promissory estoppel. "Promissory estoppel is the name applied to a contract implied in law where no contract exists in fact." *Del Hayes & Sons*, 230 N.W.2d at 593. Its elements under Minnesota law were adopted from the Restatement (Second) of Contracts § 90:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Del Hayes & Sons*, 230 N.W.2d at 593 n. 6; *Constructors Supply v. Bostrom Sheet Metal Works*, 291 Minn. 113, 190 N.W.2d 71, 74 (1971).

Murphy claims that Starry cannot rely upon promissory estoppel because their relationship was governed by a written contract, citing *Del Hayes & Sons*. In addition, Murphy contends that promissory estoppel cannot apply where there is no evidence of unconscionable conduct.

Starry's first response is essentially that because the Court permitted it to amend its complaint to assert a claim based upon promissory estoppel, its claim survives summary judgment. Starry then contends that its promissory estoppel claim rests not only on Billingsley's April 1990 promise that Murphy would supply an additional 5,000 tons of oil, but also on numerous unspecified promises in which both Billingsley and Palmgren reaffirmed the initial promise. Finally, Starry contends without providing support that Murphy never intended to supply the additional 5,000 tons of asphalt cement oil. A jury should therefore decide whether Murphy's promises were knowingly untrue when made.

■ Starry clearly cannot rely solely upon its pleadings in defense of this motion for summary judgment. *See Celotex*, 477 U.S. at 324. Stating a claim for relief is not the same as presenting evidence supporting that claim. In addition, Starry neglects to address the claim that promissory estoppel does not apply when the parties have a valid contract. According to the supreme court in *Del Hayes*, the doctrine of promissory estoppel is wholly inapplicable where an actual contract exists. *Del Hayes & Sons*, 230 N.W.2d at 593; *accord Lunning*, 303 N.W.2d at 459 ("There is no need to imply a contract … [when] both parties agree that a contract did exist."); *Sacred Heart*, 232 N.W.2d at 923 n. 1. Here the parties agree that there was an actual contract for 20,000 tons of asphalt cement oil. There is therefore no justification for implying a modification by operation of law. Furthermore, there is, as noted above, no evidence that Murphy never intended to perform any alleged promises at the time they were made. Murphy is entitled to summary judgment as to this claim as well.

#### 2. Negligent Misrepresentation

In Count IV of its second amended complaint, Starry sets forth a claim for negligent misrepresentation. Minnesota has adopted that tort as defined in the Restatement (Second) of Torts § 552(1):

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by

**2.** The Court has received and reviewed correspondence from both parties regarding this issue.

their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*L & H Airco, Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 378 n. 2 (Minn.1989); *see Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291, 298 (1976); *Hurley v. TCF Banking & Sav., F.A.,* 414 N.W.2d 584, 590 (Minn.Ct. App.1987).

Murphy claims that the tort of negligent misrepresentation does not provide an alternative basis of recovery for breach of an alleged oral contract. For the tort to apply, Murphy contends that the tortfeasor must be in the business of selling information. In this case any alleged representations were part of the arm's-length negotiations surrounding a sales contract. Murphy also claims that any and all representations concerned future conduct, and not a material present fact, and are therefore not actionable. Because there is no evidence that Murphy misrepresented its intent at the time the alleged oral agreement was made, Murphy argues that it is entitled to summary judgment on this claim as a matter of law.

Unfortunately, Starry responds by incorporating the arguments in its memorandum in support of its motion to amend the complaint. *See* Pl.'s Mem. in Opp'n to Summ. J., Exs. F, G, & H. As noted above, however, the standard for summary judgment differs substantially from that applicable upon a motion to amend. Thus, Starry does not refute Murphy's arguments.

■ Courts in other jurisdictions have clearly held that negligent misrepresentation applies only to those in the business of selling or supplying information. *See, e.g., Hi–Grade Cleaners, Inc. v. American Permac, Inc.,* 561 F.Supp. 643, 644 (N.D.Ill. 1982) ("We have found no cases supporting an action for negligent misrepresentation where a party to a contract stated that it would perform under the contract and then did not."); *Western Energy, Inc. v. Georgia–Pacific Corp.,* 55 Or.App. 138, 637 P.2d 223, 227 n. 6 (1981) (extensive comments to Restatement (Second) of Torts § 552 and illustrations deal with those acting in a professional capacity or those with some special expertise upon which the recipient of the information is especially relying). The parties cite no Minnesota cases addressing this specific issue. What does seem clear, however, is that while Starry has presented evidence that Murphy promised to provide the asphalt cement oil, Starry points to no evidence that Murphy did not intend to perform those alleged promises at the time they were made. *Cf. Cohen v. Cowles Media Co.,* 457 N.W.2d 199, 202 (Minn.1990) ("A representation as to future acts does not support an action for fraud merely because the represented act did not happen, unless the promisor did not intend to perform at the time the promise was made."), *rev'd on other grounds,* ––– U.S. ––––, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). Indeed, Minnerath admitted that he has no reason to believe that Murphy did not intend to live up to whatever promises it made. Def.'s Mem. in Supp. of Summ. J., Ex. A at 127–28 (Minnerath Dep.). Murphy is therefore entitled to summary judgment as to Count IV of the second amended complaint as well.[3]

Accordingly, based upon the foregoing, and upon all the files and proceedings herein,

IT IS ORDERED that defendant's motion for summary judgment as to all counts in the complaint is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**3.** In Count III of its second amended complaint, Starry sets forth an additional affirmative claim based upon equitable estoppel. The Court finds that Starry has failed to present any evidence demonstrating that Murphy misrepresented any material facts. Thus, Murphy is entitled to summary judgment as to this claim as well.

Because its resolution of defendant's motion is dispositive, the Court need not address plaintiff's motion for summary judgment as to defendant's commercial impracticability defense.