# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-1486

CLOUD CORPORATION,

*Plaintiff-Appellant,*

v.

HASBRO, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 3457—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED NOVEMBER 8, 2002—DECIDED DECEMBER 26, 2002

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* "Wonder World Aquarium" is a toy that Hasbro, Inc., the well-known designer and marketer of toys, sold for a brief period in the mid-1990s. The toy comes as a package that contains (we simplify slightly) the aquarium itself, some plastic fish, and, depending on the size of the aquarium (for this varies), large or small packets of a powder that when dissolved in distilled water forms a transparent gelatinous filling for the aquarium. The gel simulates water, and the plastic fish can be inserted into it with tweezers to create the illusion of a real fish tank with living, though curiously inert, fish.

"Pretend blood," included in some of the packages, can be added for even greater verisimilitude. The consumer can choose among versions of Wonder World Aquarium that range from "My Pretty Mermaid" to "Piranha Attack"—the latter a scenario in which the pretend blood is doubtless a mandatory rather than optional ingredient.

Hasbro contracted out the manufacture of this remarkable product. Southern Clay Products Company was to sell and ship Laponite HB, a patented synthetic clay, to Cloud Corporation, which was to mix the Laponite with a preservative according to a formula supplied by Hasbro, pack the mixture in the packets that we mentioned, and ship them to affiliates of Hasbro in East Asia. The affiliates would prepare and package the final product—that is, the aquarium, the packet of gel, and the plastic fish (and "pretend blood")—and ship it back to Hasbro in the United States for distribution to retailers.

The project was in operation by the middle of 1995. Hasbro would from time to time issue purchase orders for a specified number of large and small packets to Cloud, which would in turn order the quantity of Laponite from Southern Clay Products that it needed in order to manufacture the specified number of packets. The required quantity of Laponite depended not only on the number of large and small packets ordered by Hasbro but also on the formula that Hasbro supplied to Cloud specifying the proportion of Laponite in each packet. The formula was changed frequently. The less Laponite per packet specified in the formula, the more packets could be manufactured for a given quantity of the ingredient.

Early in 1997 Hasbro discovered that its East Asian affiliates, the assemblers of the final package, had more than enough powder on hand to supply Hasbro's needs,

which were diminishing, no doubt because Wonder World Aquarium was losing market appeal. Mistakenly believing that Hasbro's market was expanding rather than contracting, Cloud had manufactured a great many packets of powder in advance of receiving formal purchase orders for them from Hasbro. Hasbro refused to accept delivery of these packets or to pay for them. Contending that this refusal was a breach of contract, Cloud sued Hasbro in federal district court in Chicago, basing jurisdiction on diversity of citizenship and seeking more than $600,000 in damages based mainly on the price of the packets that it had manufactured and not delivered to Hasbro and now was stuck with—for the packets, being usable only in Wonder World Aquaria, had no resale value. After a bench trial, the district judge ruled in favor of Hasbro.

Cloud does not quarrel with the district judge's findings of fact, but only with her legal conclusions. The governing law is the Uniform Commercial Code as interpreted in Illinois.

The original understanding between Hasbro and Cloud regarding Cloud's role in the Wonder World Aquarium project either was not a contract or was not broken—probably the former, as the parties had not agreed on the price, quantity, delivery dates, or composition of the packets. These essential terms were set forth in the purchase orders that Hasbro sent Cloud, confirming discussions between employees of Cloud and Kathy Esposito, Hasbro's employee in charge of purchasing inputs for the company's foreign affiliates. Upon receipt of a purchase order, Cloud would send Hasbro an order acknowledgment and would order from Southern Clay Products the quantity of Laponite required to fill the purchase order.

In October 1995, which is to say a few months after the launch of Wonder World Aquarium, Hasbro sent a letter

to all its suppliers, including Cloud, that contained a "terms and conditions" form to govern future purchase orders. One of the terms was that a supplier could not deviate from a purchase order without Hasbro's written consent. As requested, Cloud signed the form and returned it to Hasbro. Nevertheless, to make assurance doubly sure, every time Hasbro sent a purchase order to Cloud it would include an acknowledgment form for Cloud to sign that contained the same terms and conditions that were in the October letter. Cloud did not sign any of these acknowledgment forms. The order acknowledgments that it sent Hasbro in response to Hasbro's purchase orders contained on the back of each acknowledgment Cloud's own set of terms and conditions—and the provision in Hasbro's letter and forms requiring Hasbro's written consent to any modification of the purchase order was not among them. There was a space for Hasbro to sign Cloud's acknowledgment form but it never did so. Neither party complained about the other's failure to sign the tendered forms.

Hasbro placed its last purchase orders with Cloud in February and April 1996. The orders for February specified 2.3 million small packets and 3.2 million large ones. For April the numbers were 1.5 and 1.4 million. Hasbro notified Cloud of the formula that it was to use in making the packets and Cloud ordered Laponite from Southern Clay Products accordingly.

Now as it happened Southern Clay Products was having trouble delivering the Laponite in time to enable Cloud to meet its own delivery schedule. In June 1996, amidst complaints from Hasbro's East Asian affiliates that they were running out of powder, and concerned about the lag in Laponite deliveries, Hasbro notified Cloud that it was to use a new formula in manufacturing the powder, a formula that required so much less Laponite

that the same quantity would enable Cloud to produce a third again as many packets. Cloud determined that by using the new formula it could produce from the quantity of Laponite that it had on hand 4.5 million small and 5 million large packets, compared to the 3.8 and 3.9 million called for by the February and April orders but not yet delivered. Cloud had delivered 700,000 of the large packets ordered in February and April; that is why it had 7.7 million packets still to deliver under those orders rather than 8.4 million, the total number of packets ordered ($2.3 + 3.2 + 1.5 + 1.4 = 8.4$).

Although it had received no additional purchase orders, Cloud sent Hasbro an order acknowledgment for 4.5 million small and 5 million large packets with a delivery date similar to that for the April order, but at a lower price per packet, reflecting the smaller quantity of Laponite, the expensive ingredient in the powder, in each packet.

Cloud's acknowledgment was sent in June. Hasbro did not respond to it—at least not explicitly. It did receive it, however. And Kathy Esposito continued having e-mail exchanges and phone conversations with Cloud. These focused on delivery dates and, importantly, on the quantities to be delivered on those dates. Importantly because some very large numbers—much larger than the February and April numbers, numbers consistent however with Cloud's order acknowledgment sent to Hasbro in June—appear in these and other e-mails written by her. In two of the e-mails the quantity Cloud is to ship is described as "more or less depending on the formula," consistent with Cloud's understanding that if the formula reduced the amount of Laponite per packet Cloud should increase the number of packets it made rather than return unused Laponite to Southern Clay Products. A notation made in August by another member of Hasbro's

purchasing department, Maryann Ricci—"Cloud O/S; 4,000,000 sm; 3.5 million lg."—indicates her belief that Cloud had outstanding ("O/S") purchase orders for 4 million small and 3.5 million large packets. These numbers were far in excess of the undelivered portions of the February and April orders; and since all the earlier orders had, so far as we can determine, already been filled and so were no longer outstanding, she must have been referring to the numbers in Cloud's June order acknowledgment.

The district judge, despite ruling for Hasbro, found that indeed "Hasbro intended to exceed the quantities of . . . packages it had ordered from Cloud in February and April of 1996," that "Hasbro was more concerned with prompt product than with the specific terms of its order[s]," and, most important, that "given Hasbro's repeated message that it could not get enough Laponite HB to fill its needs in a timely fashion, Cloud's decision to produce as many packets as possible appeared to be a safe course of action. Cloud was trying to keep pace with Hasbro's Laponite HB needs, a task made virtually impossible by the length of time it took Southern Clay to fill Cloud's Laponite HB orders." The judge even suggested that given Hasbro's desperation, Cloud could have persuaded Hasbro to execute additional purchase orders at prices equal to those in the February and April orders. Instead, rather than trying to take advantage of Hasbro's fix, Cloud reduced its price to reflect its lower cost. A curious consequence of the reduction, unremarked by the parties, is that even if Cloud has no contract remedy, it has (unless time barred) a remedy in quantum meruit for the benefit it conferred on Hasbro by voluntarily reducing the price specified in the February and April purchase orders.

When some months later Hasbro pulled the plug on Wonder World Aquarium, Cloud had not begun delivering

any of the additional quantity that it had manufactured over and above the quantities called for in the February and April purchase orders.

Was Cloud commercially unreasonable in producing the additional quantity without a purchase order? If not, should the Uniform Commercial Code, which was intended to conform sales law to the customs and usages of business people, UCC §§ 1-102(2)(b), 1-105 comment 3; *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988); Kerry Lynn Macintosh, "Liberty, Trade, and the Uniform Commercial Code: When Should Default Rules Be Based on Business Practices?" 38 *Wm. & Mary L. Rev.* 1465, 1488-91 (1997), nevertheless condemn Cloud, as the district judge believed, for failing to request written purchase orders for the additional quantity that the change in formula enabled it to manufacture? Or was Hasbro contractually obligated to pay for that additional quantity?

The answer to these questions depends on whether there was a valid modification of the quantity specifications in the February and April purchase orders (obviously Hasbro cannot complain about the price modification!). The October letter provided that purchase orders could not be modified without Hasbro's written consent. Cloud signed the letter and so became bound by it, consideration being furnished by Hasbro's continuing to do business with Cloud. Hasbro's order acknowledgments accompanying its February and April purchase orders also provided that the orders could not be modified without Hasbro's written consent.

Cloud did not sign Hasbro's acknowledgments and its own acknowledgments omitted the provision requiring that any modification have Hasbro's written consent. But these facts have no significance. In the case of discrepant order and acceptance forms, if the acceptance merely adds

a term, that term binds the offeror, UCC § 2-207(1); this modification of the common law's "mirror image" rule minimizes transaction costs by eliminating a negotiation over the additional term unless the offeror is unwilling to accede to the offeree's desire for it. But what if the term added by the acceptance contradicts a term in the offer? Then it doesn't become a part of the contract—that much is clear. § 2-207(2)(b). But is there a contract, and if so what are its terms? The UCC doesn't say, but the majority rule, and the rule in Illinois, is that the inconsistent terms cancel each other out and the court fills the resulting void with a term of its own devising. William B. Davenport, Daniel R. Murray & Donald R. Cassling, *Uniform Commercial Code with Illinois Code Comments* § 5/2-207, Illinois Code Comment 11, pp. 126-27 (Illinois Practice Series, vol. 2a, 1997).

In this case, however, there was neither a supplemental nor an inconsistent term in the acceptance; there was *no* term concerning modification, and in such a situation Hasbro's term is enforceable. *Earl M. Jorgensen Co. v. Mark Construction, Inc.*, 540 P.2d 978, 982-83 (Hawaii 1975); 1 James J. White & Robert S. Summers, *Uniform Commercial Code* 15-16 (4th ed. 1995). It is a case of different but not inconsistent terms, in which event the acceptance is effective to make a contract. UCC § 2-207(1). The offeree's silence is not interpreted as rejection in this situation because transaction costs would again be higher if the offeror had to quiz the offeree on whether every term in the offer not mentioned in the acceptance was acceptable to the offeree. Cloud, the offeree, knew that Hasbro wanted the modification provision and if this was unacceptable it should have said so.

For unexpressed reasons the district judge did not focus on the contractual provisions requiring that any

modification of a purchase order be in writing. She considered only whether the UCC's statute of frauds required this, and ruled that it did. The quantity term in a contract for the sale of goods for more than $500 must be memorialized in a writing signed by the party sought to be held to that term, UCC § 2-201(1), and so, therefore, must a modification of that term. UCC § 2-209(3). However—and here we part company with the district judge—Kathy Esposito's e-mails, plus the notation that we quoted earlier signed by Maryann Ricci, another member of Hasbro's purchasing department, satisfy the statutory requirement. The UCC does not require that the contract itself be in writing, only that there be adequate documentary evidence of its existence and essential terms, which there was here. *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1229-31 (7th Cir. 1995); *Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1185 (7th Cir. 1991); *Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1233 n. 6 (5th Cir. 1993).

But what shall we make of the fact that Kathy Esposito's e-mails contained no signature? The Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001, provides that in all transactions in or affecting interstate or foreign commerce (the transactions between Cloud and Hasbro were in interstate commerce and affected both interstate and foreign commerce), a contract or other record relating to the transaction shall not be denied legal effect merely because it is in electronic form. That would be conclusive in this case—had the e-mails been sent after the Act took effect in 2000. But they were sent in 1996. The Act does not purport to be applicable to transactions that occurred before its effective date, and, not being procedural, compare *Landgraf v. USI Film Products*, 511 U.S. 244, 275 (1994), it is presumed not to apply retroactively. *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 745 (6th

Cir. 1999). But like the court in *Shattuck v. Klotzbach*, No. 011109A, 2001 WL 1839720, at *2-3 (Mass. Super. Dec. 11, 2001), we conclude without having to rely on the federal Act that the sender's name on an e-mail satisfies the signature requirement of the statute of frauds. *Toghiyany v. AmeriGas Propane, Inc.*, 309 F.3d 1088, 1091 (8th Cir. 2002), another e-mail case that does not cite the electronic signatures act (maybe because, as in this case, the contract predated the Act), tugs the other way. But it is unclear whether the court thought the absence of a signature fatal or thought that it was that absence combined with the absence of an essential term—the duration of the contract—that triggered the statute of frauds.

Neither the common law nor the UCC requires a *handwritten* signature, *Just Pants v. Wagner*, 617 N.E.2d 246, 251 (Ill. App. 1993); *Monetti, S.P.A. v. Anchor Hocking Corp., supra*, 931 F.2d at 1182; *Hillstrom v. Gosnay*, 614 P.2d 466, 469 (Mont. 1980); Davenport, Murray & Cassling, *supra*, § 5/1-201, Illinois Code Comment 42, pp. 53-54; cf. *Restatement (Second) of Contracts* § 134, comment a (1981), even though such a signature is better evidence of identity than a typed one. It is not customary, though it is possible, to include an electronic copy of a handwritten signature in an e-mail, and therefore its absence does not create a suspicion of forgery or other fraud—and anyway an electronic copy of a signature could *be* a forgery.

The purpose of the statute of frauds is to prevent a contracting party from creating a triable issue concerning the terms of the contract—or for that matter concerning whether a contract even exists—on the basis of his say-so alone. That purpose does not require a handwritten signature, especially in a case such as this in which there is other evidence, and not merely say-so evidence, of the existence of the contract (more precisely, the contract

modification) besides the writings. The fact that Cloud produced the additional quantity is pretty powerful evidence of a contract, *Consolidation Services, Inc. v. KeyBank National Ass'n*, 185 F.3d 817, 821 (7th Cir. 1999); *Monetti, S.P.A. v. Anchor Hocking Corp., supra*, 931 F.2d at 1183, as it would have been taking a terrible risk in doing so had it thought it would have no right to be paid if Hasbro refused to accept delivery, but would instead be stuck with a huge quantity of a product that had no salvage value. Actually, in the case of a contract for goods specially manufactured by the buyer, partial performance by the seller takes the contract outside the statute of frauds, without more. UCC § 2-201(3)(a). This may well be such a case; but we need not decide.

The background to the modification—the fact that the parties had dealt informally with each other (as shown by their disregard of the form contracts), and above all that Hasbro plainly wanted more product and wanted it fast— is further evidence that had Cloud asked for a written purchase order in June 1996 for the additional quantity, Hasbro would have given it, especially since Cloud was offering a lower price.

There is more: "between merchants [a term that embraces 'any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants,' UCC § 2-104(3)] if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection 1 [the statute of frauds] . . . unless written notice of objection to its contents is given within 10 days after it is received." UCC § 2-201(2). Cloud sent an order acknowledgment, reciting the increased quantity, shortly after the oral modification, and Hasbro did not object within ten

days. *Campbell v. Yokel,* 313 N.E.2d 628, 628-31 (Ill. App. 1974); *Klockner, Inc. v. Federal Wire Mill Corp.,* 663 F.2d 1370, 1374, 1376 (7th Cir. 1981); *Apex Oil Co. v. Vanguard Oil & Service Co.,* 760 F.2d 417, 423 (2d Cir. 1985).

So Hasbro's statute of frauds defense fails on a number of independent grounds. But what of the *contractual* requirement of the buyer's consent in writing to any modification? Could that stiffen the requirements of the UCC's statute of frauds? Parties are free to incorporate stronger conditions for contractual modification than the UCC provides: "A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." UCC § 2-209(2); see *Martinsville Nylon Employees Council Corp. v. NLRB,* 969 F.2d 1263, 1267 (D.C. Cir. 1992); *Wisconsin Knife Works v. National Metal Crafters,* 781 F.2d 1280, 1292 (7th Cir. 1986) (dissenting opinion); Frank A. Rothermel, Comment, "Role of Course of Performance and Confirmatory Memoranda in Determining the Scope, Operation and Effect of 'No Oral Modification' Clauses," 48 *U. Pitt. L. Rev.* 1239, 1251-52 (1987). The UCC's statute of frauds requires only quantity terms to be in writing. The contractual requirement that the buyer's consent be in writing was not limited to quantity terms, but this makes no difference, since those are the terms in dispute.

Could the contractual statute of frauds (to speak oxymoronically) be broader in a different sense? Specifically, could "consent in writing" require an explicit written statement of consent, missing here, rather than merely an inference of consent from a writing or series of writings? Maybe, but Hasbro does not argue that the contractual statute of frauds in this case has any different scope from

the statutory, though it seems highly unlikely that a no-oral-modification clause would be subject to the exception in section 2-201(2) (quoted earlier) to the statute of frauds. Such a clause is added to a contract when the parties want to draft their own statute of frauds, as they are permitted to do; and there is no reason to suppose that they would want to adopt wholesale the limitations that the UCC imposes on its own statute of frauds. If they wanted those limitations they wouldn't need their own, customized clause.

So we may set section 2-201(2) to one side. That leaves intact, however, Cloud's argument, which we have accepted, that there was adequate evidence of written consent to the modification. And it leaves intact still *another* alternative argument by Cloud: "an attempt at modification" that does not satisfy the statute of frauds nevertheless "can operate as a waiver." § 2-209(4). The word "can" is key. To prevent the "attempt" provision from eviscerating the statute of frauds, the courts require that the attempting modifier, Cloud in this case, must show either that it reasonably relied on the other party's having waived the requirement of a writing, *Wisconsin Knife Works v. National Metal Crafters, supra*, 781 F.2d at 1286-87 (7th Cir. 1986); *American Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir. 1995); contra, *BMC Industries, Inc. v. Barth Industries, Inc.*, 160 F.3d 1322, 1333 (11th Cir. 1998), or that the waiver was clear and unequivocal. *In re Nitz*, 739 N.E.2d 93, 103 (Ill. App. 2000); *Lavelle v. Dominick's Finer Foods, Inc.*, 592 N.E.2d 287, 291-92 (Ill. App. 1992); *McElroy v. B.F. Goodrich Co.*, 73 F.3d 722, 724 (7th Cir. 1996); *Bank v. Truck Ins. Exchange*, 51 F.3d 736, 739 (7th Cir. 1995). This exception to the statute of frauds applies equally to the "buyer's written consent" provision of the parties' contracts, UCC § 2-209(4); *Wisconsin Knife Works v. National Metal Crafters, supra*, 781 F.2d at 1284-87, be-

cause waiver is a general doctrine of contract law rather than an appendage to the statute of frauds.

The district judge erred by requiring that Cloud show *both* reasonable reliance and that the waiver was clear and unequivocal. There was no clear and unequivocal waiver, but there was reliance. The judge *found* reliance. She found that Cloud had been acting in good faith in producing the additional quantity of packets because it reasonably believed that Hasbro wanted the additional quantity. But she concluded that Cloud had been unreasonable in relying on its reasonable belief because it could so easily have insisted on a written purchase order modifying the quantity terms in the February and April orders. Reasonableness, however, is relative to commercial practices and understandings rather than to the desire of judges and lawyers, reflecting their training and professional culture, to see a deal memorialized in a form that leaves no room for misunderstanding the legal consequences. The employees of Hasbro and Cloud who were responsible for the administration of the parties' contractual undertaking were not lawyers. Doubtless because of this, the parties had, as we have noted, been casual about documentation. Cloud had treated the purchase orders as sources of information on how much Hasbro wanted when and according to what formula, but had paid no attention to them as contracts containing terms and conditions that might bind it. Hasbro had treated Cloud's purchase-order acknowledgments with similar insouciance. The parties had a smooth working relationship the details of which were worked out in informal communications. With time of the essence and the parties on good terms and therefore careless or impatient with formalities, Cloud was reasonable in believing that *if* Hasbro didn't want to be committed to buying the additional quantity that it plainly wanted in the summer and autumn of 1996, it would so

advise Cloud rather than leading Cloud down the primrose path. A practice, under the rubric of "course of dealing," can be evidence of what a contract requires, see, e.g., UCC § 1-205; *Restatement (Second) of Contracts* § 223 (1981); *Frank Novak & Sons, Inc. v. Sommer & Maca Industries, Inc.*, 538 N.E.2d 700, 703-05 (Ill. App. 1989)—can even, under the rubric of "contract implied in fact," give rise to binding contractual obligations though no words are spoken. *Brines v. XTRA Corp.*, 304 F.3d 699, 703 (7th Cir. 2002).

Cloud could have been more careful. But a failure to insist that every i be dotted and t crossed is not the same thing as being unreasonable. In any event, to repeat an earlier point, Hasbro did give its written consent to the modification.

We conclude that the June modification was enforceable and we therefore reverse the judgment and remand the case for a determination of Cloud's damages.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*