**HANWHA CORPORATION, Plaintiff,**

v.

**CEDAR PETROCHEMICALS, INC., Defendant.**

**No. 09 Civ. 10559(AKH).**

United States District Court, S.D. New York.

Jan. 18, 2011.

Sooyung T. Lee, Costello, Cooney & Fearon, PLLC, Syracuse, NY, for Plaintiff.

John Thomas Lillis, Jr., Kennedy Lillis Schmidt & English, New York, NY, for Defendant.

### OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DENYING CROSS–MOTION

ALVIN K. HELLERSTEIN, District Judge:

Plaintiff Hanwha Corporation ("Hanwha") has sued Defendant Cedar Petro-

chemicals, Inc. ("Cedar") in a two-count complaint alleging breach of contract. The complaint arises from the parties' disagreement about the choice of law to govern their contract for the sale and purchase of an amount of the petrochemical Toluene. Cedar now moves under Federal Rule of Civil Procedure 56 for summary judgment dismissing the complaint, contending the parties never formed a final contract; Hanwha cross-moves for summary judgment in its own favor. For the reasons that follow, I hold that because the parties could not agree on a choice of law, they did not form a contract. I therefore grant Cedar's motion for summary judgment dismissing the complaint, and I deny Hanwha's cross-motion.

## I. Background

From January 2003 to April 2009, Cedar, a New York corporation, and Hanwha, a Korean corporation, entered into twenty discrete transactions for the purchase and sale of various petrochemicals. In each of the twenty transactions, the parties formed contracts under the same procedure. First, Hanwha would submit a bid to Cedar for a given petrochemical at a given quantity and at a given price. Cedar would accept Hanwha's bid, forming what the parties describe as a "firm bid," or an agreement regarding product, quantity, and price. Following formation of the firm bid, Cedar would transmit a package of contract documents to Hanwha, meant to incorporate and finalize all the terms of the contract. The package of documents contained two items: (i) a "contract sheet" that embodied the terms of the firm bid and a choice of law to govern the contract, and (ii) a set of "standard" terms and conditions incorporated by reference in the

contract sheet. Cedar always signed the contract sheet when submitting these documents to Hanwha.

The contract sheets drafted by Cedar for the twenty contracts provide the same substantive information, which can be described in three parts. First, at the top, Cedar provided a provision stating, "We hereby confirm the following transaction between Hanwha Corp. and ... Cedar Petrochemicals, [The] [f]ollowing sets forth the entire agreement of the parties." Declaration of William H. Sparke III in Support of Cedar Petrochemical's Summary Judgment Motion ("Spark Decl."), Exs. 1–20. Second, in the body of the contract sheets, Cedar would identify the product, quantity, and price contemplated by the firm bid. Third, at the bottom, Cedar would provide a provision incorporating the standard terms and conditions by reference. This final provision also identified the laws Cedar chose to govern the contracts, and typically provided that New York law, the Uniform Commercial Code ("UCC"), and Incoterms 2000[1] governed the contract. This choice of law was reinforced by a provision in Cedar's standard terms and conditions, which also provided that New York law was to govern.

After Cedar would send these signed contract documents to Hanwha, Hanwha would do one of three things: it would countersign and return the contract sheet, accepting Cedar's terms; or modify the contract sheet, and then sign and return it for Cedar's consideration; or not sign at all. On three occasions, Hanwha modified the contract sheets by providing its own choice of law to govern the contracts. Whenever Hanwha modified the contract

---

1. Generally speaking, "Incoterms" is a set of standard trade terms, developed by the International Chamber of Commerce, meant to provide parties international contracts for the sale of goods with clear definitions of respective rights and liabilities with regard to the shipment of the goods.

sheets and sent them back to Cedar, Cedar did not object to the changes—including Hanwha's choices of law—but did not countersign Hanwha's version. On all twenty occasions, upon completion of this process, Cedar and Hanwha both performed their obligations under their contracts.

The present case concerns the parties' efforts to form a twenty-first contract. On May 27, 2009, Hanwha submitted a bid for the purchase of 1,000 metric tons of the petrochemical Toluene at $640 per metric ton, the market rate at the time. Cedar accepted the bid, thus creating a firm bid for the purchase and sale of the Toluene. Cedar followed up its acceptance of the bid by sending Hanwha, via email, a signed contract sheet and a document setting forth Cedar's usual standard terms and conditions. As per usual, Cedar provided in the contract sheet that New York law, the UCC, and Incoterms 2000 would govern the contract, and also provided in the standard terms and conditions that New York law would govern. Hanwha did not immediately respond to the contract documents, but engaged with Cedar in preparing a bill of lading and nominating a vessel for the ocean carriage.

Approximately a week after Cedar had sent Hanwha the contract documents for the Toluene sale, Hanwha returned them in modified form. On the contract sheet, Hanwha had modified the provision providing for governing law, crossing out New York law and the UCC, leaving only the provision that Incoterms 2000 was to govern the contract. Hanwha also provided a new set of "standard" terms and conditions; in relevant part, Hanwha's new set of conditions provided that Singapore law would govern the contract, rather than New York law. In summary, Hanwha struck Cedar's nomination of New York law, the UCC, and Incoterms 2000 to govern the contract, substituting instead Singapore law and Incoterms 2000.

When Hanwha returned the amended contract documents, it added an additional term, stated in the body of the email transmitting the amended documents. In the email, Hanwha provided that no contract would "enter into force" unless Cedar countersigned Hanwha's proposed version of the contract documents. Declaration of Cho Yong in Support of Cedar Petrochemical's Motion to Dismiss ("Cho Yong Decl."), Ex. 6. Cedar refused to accept Hanwha's terms, and sent Hanwha an email explaining that the contract would be finalized only if Hanwha accepted Cedar's original terms. The email asked Hanwha to sign and return an unaltered version of the contract documents.

While Cedar waited for a response to this last request, the parties worked out the necessary letter of credit for the transaction. Hanwha submitted a letter of credit unsatisfactory to Cedar on June 8, 2009, and an acceptable letter of credit on June 10, 2009. However, the next day, June 11, 2009, Cedar advised Hanwha that because of its failure to sign the version of the contract tendered by Cedar, there was no contract between the parties, and Cedar had the right to sell the Toluene to another party. The price of Toluene as of that date, June 11, 2009, had risen from $640 per metric ton to $790.50.

In November 2009, Hanwha filed a two-count complaint in Supreme Court, New York County, alleging (i) breach of contract by Cedar for failing to deliver the Toluene at the agreed-upon price and (ii) anticipatory breach of contract for Cedar's statement of June 11, 2009 that the deal was void and it was free to sell the Toluene to another buyer. The complaint also stated that the dispute arose under United Nations Convention on Contracts for the International Sale of Goods ("CISG"), S. Treaty Doc. No. 9, 98th Cong., 1st Sess. 22

(1983), 19 I.L.M. 671, *reprinted at* 15 U.S.C. app. (1997), thus creating federal subject-matter jurisdiction under 28 U.S.C. § 1331. Cedar removed the case to this court, and Hanwha thereafter moved unsuccessfully to remand. *Order Denying Motion to Remand,* 09 Civ. 10559, Doc. No. 15 (S.D.N.Y. Apr. 21, 2010). The parties now move and cross-move for summary judgment.

## II. Standard of Review

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). On cross motions for summary judgment, the district court is obligated to consider each motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Byrne v. Rutledge,* 623 F.3d 46, 52–53 (2d Cir.2010) (internal quotations omitted). In considering a motion for summary judgment, "the mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). Further, "to defeat summary judgment ... nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts ... and they may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of N.Y.,* 426 F.3d 549, 554 (2d Cir.2005) (internal quotation omitted) (alteration in original).

## III. Discussion

### a. Choice of Law

Before deciding whether the parties formed a contract, I must establish which law governs the analysis. Here, both parties are members of CISG signatory nations, but they have attempted to opt out of the CISG's substantive terms by designating other choices of substantive law. The question therefore arises whether the CISG, some other law, or both, governs the question of contract formation.

■ The CISG is a self-executing treaty, binding on all signatory nations, that creates a private right of action in federal court under federal law. *Delchi Carrier SpA v. Rotorex Corp.,* 71 F.3d 1024, 1027–28 (2d Cir.1995). As a treaty, the CISG is a source of federal law. *See* 28 U.S.C. § 1331(a); *Usinor Industeel v. Leeco Steel Prods., Inc.,* 209 F.Supp.2d 880, 884 (N.D.Ill.2002); *Asante Techs., Inc. v. PMC–Sierra, Inc.,* 164 F.Supp.2d 1142, 1147 (N.D.Cal.2001); *Riccitelli v. Elemar New England Marble and Granite, LLC,* 08 Civ. 1783, 2010 WL 3767111, at *4 (D.Conn.2010). Because caselaw interpreting the CISG is relatively sparse, this Court is authorized to interpret it in accordance with its general principles, "with a view towards the need to promote uniformity in its application and the observance of good faith in international trade." *Delchi Carrier,* 71 F.3d at 1028 (internal quotations omitted). "Caselaw interpreting analogous provisions of Article 2 of the Uniform Commercial Code ("UCC") may also inform a court where the language of the relevant CISG provisions track that of the UCC." *Id.* at 1028.

■ The intent to opt out of the CISG must be set forth in the contract clearly and unequivocally. *See St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support,* 00 Civ. 9344, 2002 WL 465312, at *3 (S.D.N.Y. Mar. 26, 2002); *Asante Techs.,* 164 F.Supp.2d at 1149–50 (declining to ap-

ply a choice-of-law clause that did not "evince a clear intent to opt out of the CISG"); *see also Delchi Carrier*, 71 F.3d at 1027 n. 1 (where the contract is silent on a choice of law, the CISG governs). Absent a clear choice of law, "the Convention governs *all* contracts between parties with places of business in different nations, so long as both nations are signatories to the Convention." *Filanto, S.p.A. v. Chilewich Intern. Corp.*, 789 F.Supp. 1229, 1237 (S.D.N.Y.1992) (emphasis in original).

■ In this case, the parties each attempted to opt out of the CISG, but could not agree on the law to displace it, Cedar preferring New York law and the UCC, and Hanwha preferring Singapore law. This situation is not unlike the one contemplated by UCC § 2–207(b), which notes that terms upon which contracting parties do not agree are not part of the contract.[2] In such a situation, the extraneous terms "fall away" and typically leave the Court with the obligation to provide a term of its own crafting. *See, e.g., Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 294–95 (7th Cir.2002) (Posner, J.). Here, the parties never agreed to a substantive law to displace the CISG, and their competing choices must fall away, leaving the CISG to fill the void by its own self-executing force.

■ Accordingly, in resolving these motions for summary judgment, I apply the terms of the CISG without regard to the law either party attempted to select when bargaining over the terms of the last contract.

### b. The Merits

The issue in this case is whether Hanwha made a binding offer within the meaning of the CISG when it bid on the 1,000 metric tons of Toluene. Several articles of the CISG bear upon this issue. First, Article 14 of the CISG states, "[a] proposal for concluding a contract addressed to one or more specific persons constitutes an offer if it is sufficiently definite *and* indicates the intention of the offeror to be bound in case of acceptance." CISG art. 14(1) (emphasis added). Second, in complementary fashion, Article 8 of the CISG sets out the relevant considerations for finding an offeror's intent. It states in full:

(1) For the purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what the intent was.

(2) If the preceding paragraph is not applicable, statements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances.

(3) In determining the intent of a party or the understanding a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties.

Finally, Article 19(1) modifies the analysis by providing that "[a] reply to an offer which purports to be an acceptance, but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer." Even if

---

2. It is immaterial that both parties agreed upon using Incoterms 2000 to govern the contract. Each party desired Incoterms 2000 to govern jointly with other law; these differing medleys of authority constitute the choices each party tried to make.

the additional or altered terms are not "material" to the contract, the offeree's amendments constitute a counter-offer if the offeror objects to them "without undue delay." *Id.* art. 19(2).

In this case, it is clear that Hanwha made, and Cedar accepted, a "sufficiently definite" offer within the meaning of Article 14(1), for Hanwha's bid was for a specific product, at a specific price, and for a specific quantity. Beyond this, however, Article 14 requires that Hanwha must also have intended to be bound when it made the bid. *Id.* On this latter point, the undisputed facts make clear Hanwha did not possess this intent. Rather, the course of dealing between the parties makes clear that neither party was to be bound until they agreed on other material terms and conditions, namely the choice of law and forum-disputes provisions.

■ As a threshold point, although the CISG expresses a preference that the offeror's intent be considered subjectively, that consideration is not possible in this case since neither party submitted any competent evidence of their subjective intentions. *See id.* art. 8(1). The parties have submitted only self-serving declarations of how they respectively viewed the other side's offers and counter-offers, from the hindsight of their dispute. Such declarations do nothing more than make out "the mere possibility of a factual dispute," *Quinn*, 613 F.2d at 445, and can be neither a basis to grant or deny either party's motion,[3] *see Jeffreys*, 426 F.3d at 554.

■ Turning to the objective analysis called for by Article 8(2), it is clear from all the relevant circumstances that Han-

wha did not intend to be bound by making its bid for the 1,000 metric tons of Toluene. *Id.* art. 8(3). In the twenty prior transactions, these parties had engaged in a familiar two-step process, whereby they first formed their firm bid and then negotiated the final terms and conditions of the contracts. On each of these twenty prior occasions, the parties did not perform until after they had achieved agreement, explicit or implicit, on all the final terms of the contract. The contract sheets reflect this, for each bears a provision stating, "[The] [f]ollowing sets forth the entire agreement of the parties." Spark Decl., Exs. 1–20. From this, it is clear that these parties did not enter into a final contract until they agreed to the final terms embodied in the contract documents, and not when they agreed Hanwha's bids on product, quantity, and price.

On this occasion, the undisputed facts show that the parties never worked out the final terms of the contract because they never formed an agreement on a term they deemed material, a choice of governing law. Previously, Hanwha had on several occasions proposed a different choice of law and Cedar had accepted the proposal, either implicitly or explicitly. The parties thereafter performed under the various contracts. But here, after Hanwha modified Cedar's contract documents and proposed a different choice of law, Cedar rejected the change. These activities constitute a counter-offer, and a rejection of the counter-offer, within the meaning of Article 19(1).

Further evidence that the parties failed to contract can be seen by the way they

---

**3.** Hanwha urges that beyond its declaration, it has provided proof of its subjective intent by pointing to other precontract activities, the acquisitions of the bill of lading and letter of credit. But these facts are just as consistent with an intent to contract as they are with pre-contracting activities undertaken in reliance on an imminent formation of a contract. Further, they do not bear upon the question whether Hanwha, in offering its bid for the Toluene, intended to be bound from the bid itself.

treated Hanwha's modification of Cedar's choice of law. Beyond simply modifying Cedar's choice of law, Hanwha insisted that Cedar accept the modification explicitly, by advising Cedar that the contract could "enter into force" only if Cedar explicitly countersigned Hanwha's version of the contract documents. Cho Yong Decl., Ex. 6. By objecting immediately and insisting on its own nomination, Cedar made clear that it regarded the change as material, thus rendering the different choice of law a material term under Article 19(2). As the parties thereafter failed to reconcile their views, it is apparent that they never formed a final contract.[4]

Finally, I note that Hanwha's alternative argument that summary judgment is inappropriate at this time is unavailing. Hanwha argues that issues of fact exist regarding the norms of contracting practices in the Korean petrochemicals industry. Where the parties have established a course of dealing between themselves, industry norms that might otherwise apply are irrelevant.

## IV. Conclusion

For the foregoing reasons, Cedar's motion for summary judgment is granted, and the case is dismissed. Hanwha's cross-motion for summary judgment is denied. The Clerk shall terminate the motions (Doc. Nos. 17 and 21) and close the case.

SO ORDERED.

---

**4.** Neither of Hanwha's principal cases provides otherwise. In neither case did the courts consider the issue whether the offeror intended to be bound by its offer. *See Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528 (9th Cir.2003); *Solae, LLC v. Hershey Canada, Inc.*, 557 F.Supp.2d 452 (D.Del.2008). Hanwha can take no comfort from such easily distinguishable cases.