**SN4, LLC, et al., Appellants,**

v.

**ANCHOR BANK, FSB, Respondent,**

**22801 7th, LLC, Respondent.**

**No. A13–1566.**

Court of Appeals of Minnesota.

June 2, 2014.

Kay Nord Hunt, Bryan R. Feldhaus, Lommen, Abdo, Cole, King & Stageberg, P.A., Minneapolis, Minnesota; and Michael L. Puklich, Neaton & Puklich, PLLP, Chanhassen, Minnesota, for appellant.

Mark W. Vyvyan, Jessica L. Edwards, Chelsea Brennan DesAutels, Fredrikson & Byron, P.A., Minneapolis, Minnesota, for respondent Anchor Bank.

Richard L. Morris, Aaron M. Lorentz, Morris Law Group, P.A., Edina, Minnesota, for respondent 22801 7th.

Considered and decided by HOOTEN, Presiding Judge; ROSS, Judge; and CRIPPEN, Judge.*

## OPINION

HOOTEN, Judge.

Appellants-buyers of real estate challenge the district court's grant of summary judgment in favor of respondent-bank, arguing that the district court erred by determining that a purported agreement does not satisfy the subscription requirement of the statute of frauds and that the evidence is insufficient for the buyers to invoke the doctrine of equitable estoppel to preclude application of the statute of frauds. Because we conclude that no reasonable fact-finder could determine that (1) the buyers and the bank agreed to electronically sign the agreement, (2) the bank electronically signed the agreement attached to e-mails, and (3) the bank mis-represented a material fact on which the buyers relied to their detriment, we affirm.

## FACTS

Appellants SN4, LLC and DN10, LLC (the buyers) are partially owned by Noel Skelton and are in the business of purchasing, reselling, and managing apartment buildings. Respondent Anchor Bank is a federal savings bank that acquired title to two foreclosed, multi-unit apartment buildings in Anoka (the Properties).

In January 2012, during a discussion regarding an unrelated real-estate transaction between the buyers and the bank, Timothy Nemec, the bank's vice president and special asset manager, informed Michael Puklich, the buyers' attorney, that the Properties were for sale. Upon learning this, Skelton visited the Properties and visually inspected them. He then requested the Properties' purchase price from Nemec, who indicated that they were for sale for more than $2 million. In June 2012, after an unsuccessful attempt to reach an agreement because of certain unsatisfactory conditions of the Properties, Nemec informed Skelton that his supervisor had approved a purchase price of $1.7 million.

In mid-July 2012, the buyers secured financing to purchase the Properties and suspended efforts to acquire other properties. On July 13, the buyers provided the bank with a hand-signed agreement to purchase the Properties for $1.7 million. By this time, the buyers and the bank had exchanged multiple drafts of the agreement. Between mid-July 2012 and January 2013, Skelton, Nemec, Puklich, Larry Berg as the bank's attorney, and Stephen Rice as the bank's vice president and manager for real-estate-owned properties, ex-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

changed numerous e-mails containing the
following relevant statements:

| Month, Day | Sender | Recipient | E-mail Message |
|---|---|---|---|
| 07/17 | Nemec | Puklich | "Attached is the revised purchase offer. Please let me know if you have any questions or comments. My attorney is reviewing the contract and I will let you know if he recommends any changes. Otherwise I will need the signed contract back." |
| 07/18 | Puklich | Nemec | "Attached please find the agreements, which Mr. Skelton has executed. You will note that . . . I changed where the earnest money will be held. . . ." |
| 07/18 | Berg | Nemec | "Attached above are clean and blacklined copies of the revised purchased agreement. Please call me after you've had a chance to review the draft." |
| 07/18 | Nemec | Puklich | "My attorney is making some changes to the [purchase agreement]. I will get that to you today, but I will need it signed in place of this one." |
| 07/18 | Nemec | Puklich | "Attached is the revised document." |
| 07/19 | Nemec | Puklich | "If you have not received it yet, here is the corrected offer that needs to be signed." |
| 07/24 | Puklich | Berg | "Can you confirm that the agreements with [the bank] are satisfactory[?] If so, can you have your client sign and I will have my client sign[?]" |
| 07/24 | Berg | Puklich | "I spoke with Tim Nemec yesterday and he is still waiting for a confirmation from his people. I'll check in with him yet today, and hopefully be able to provide you with execution copies." |
| 07/26 | Berg | Puklich | "Attached are clean and blacklined copies of the purchase agreement for the [Properties, dated July 18, 2012]. Could you confirm that this draft is acceptable to your client?" |
| 07/28 | Puklich | Berg | "It is acceptable. . . . [I]s it possible that you can have the bank sign the agreements[,] scan and email them to me[,] and I will have Mr. Skelton sign them when I see him[?]" |
| 08/02 | Puklich | Berg | "Did you [hear] from your client regarding emailing me the signed agreement? I will be seeing my client tomorrow and would like to have him sign." |
| 08/02 | Berg | Puklich | "Tim Nemec said that the purchase agreements are being signed by the bank." |
| 08/10 | Puklich | Berg | "When you have some time can you email or mail me the signed agreements?" |
| 08/10 | Berg | Puklich | "[The purchase agreements] haven't been sent to me yet, but I know they're eager to wrap this up. The last time I talked to Tim Nemec at the bank, the purchase agreements were being signed by someone at the bank's main office." |
| 08/16 | Puklich | Berg | "Any progress on getting the signed agreement?" |
| 08/16 | Berg | Puklich | "[Nemec], like you, is wondering what is taking the bank so long. I will call him again this morning. The person who used to approve these purchase agreements recently retired. I don't know if that's what is causing the delay, but I suspect it is. At any rate, I will push hard to get this wrapped up." |

On August 16, the buyers hand-signed the agreement dated July 18 that Berg sent to Puklich by e-mail on July 26, which provided that the bank agreed to purchase the Properties for $1.7 million without financing or $1.78 million with financing. The agreement permitted execution "in counterparts." It is undisputed that the bank did not hand-sign this agreement. The e-mail exchange continued:

| Month, Day | Sender | Recipient | E-mail Message |
|---|---|---|---|
| 09/21 | Rice | Skelton | "We've had a chance to view the [Properties] and gather some repair and market data. . . . I'd like to discuss the results and see [if we] can strike a deal." |
| 09/24 | Puklich | Berg | "In reviewing my file, I note that I did not receive a copy of the fully executed [July 18th] agreement, which my client approved and accepted on July 28 and signed on August 16 (copy attached). . . . I don't have a problem with this agreement being signed in counterparts but would like a copy with your client's signature. . . . I will messenger over a hard copy of the agreement. . . ." |
| 10/24 | Berg | Puklich | "Attached above is a purchase agreement for the [Properties] which has been signed by [the bank and dated October 23, 2012]. . . . If this Agreement is acceptable to your client, please have your client sign and deliver an electronic copy. We'll have 'hard copies' signed separately." |

The October 23 purchase agreement, hand-signed by Rice, provided a purchase price of $1.95 million. According to Skelton, he had "a series of telephone conversations with Rice in an effort to avoid litigation and convince Rice that the $1,700,000 sale price had not only been agreed upon by [the bank], but that the sale price was reasonable." Skelton claimed that on December 19, 2012, Rice called him and agreed to the $1.7 million sale price. On January 31, the bank informed the buyers that it decided against selling the Properties to them. That same day, the buyers sued the bank for, among other things, breach of a contract allegedly entered into on August 16, 2012, which is the day that the buyers signed the July 18th agreement.

In June 2013, the district court granted summary judgment in favor of the bank. The district court determined that "[t]he issue of contract formation and . . . breach of contract . . . cannot be resolved through summary judgment," reasoning that "[u]n-der the facts presented, including the numerous e-mails and drafted Purchase Agreements sent between the parties . . ., reasonable minds may differ as to whether an offer and acceptance was made." But the district court determined that the purported agreement does not satisfy the statute of frauds because only the buyers subscribed to it.

The district court rejected the buyers' argument that the bank electronically subscribed to the agreement under the UETA because the buyers "have failed to come forth with evidence that would suggest the parties contemplated an agreement to electronics means, much less, that an electronic signature was actually procured." The district court also rejected the buyers' argument that the doctrine of equitable estoppel precludes application of the statute of frauds, concluding that the buyers "have failed to show any evidence, disputed or otherwise, suggesting that [the bank] conducted itself in a way that misrepresen-

ted or concealed material facts beyond that of having a deal worked out." The buyers appeal.

## ISSUES

I. Did the district court err by granting summary judgment in favor of the bank because the purported agreement does not satisfy the subscription requirement of the statute of frauds?

II. Did the district court err as a matter of law by applying the statute of frauds based on its determination that the evidence in support of the buyers' equitable-estoppel claim is insufficient?

## ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. A genuine issue of material fact does not exist "when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 71 (Minn.1997). On appeal, "[w]e view the evidence in the light most favorable to the party against whom summary judgment was granted. We review de novo whether a genuine issue of material fact exists. We also review de novo whether the district court erred in its application of the law." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.,* 644 N.W.2d 72, 76–77 (Minn.2002) (citations omitted).

The statute of frauds provides that a contract for the sale of land "shall be void unless the contract, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party by whom the lease or sale is to be made, or by the party's lawful agent thereunto authorized in writing." Minn.Stat. § 513.05 (2012).

I.

■ The buyers argue that the district court erred by determining that the purported agreement fails to satisfy the subscription requirement of the statute of frauds. We presume that genuine issues of material fact exist as to the formation of the purported agreement because the bank did not file a notice of related appeal challenging the district court's determination on this issue. *See City of Ramsey v. Holmberg,* 548 N.W.2d 302, 305 (Minn. App.1996) (stating that an issue decided adversely to respondent is not properly before this court if no notice of review is filed), *review denied* (Minn. Aug. 6, 1996). Accordingly, we will not consider the bank's arguments that there was no agreement and that neither Nemec nor Berg had the authority to bind the bank to such agreement.

■ The bank maintains that, regardless of whether it reached an agreement with the buyers regarding the sale of the Properties, such purported agreement is void because it was never subscribed by the bank. "[T]he test of adequate 'subscription' [is] whether the offeror intended to authenticate the document...." *Greer v. Kooiker,* 312 Minn. 499, 506 n. 4, 253 N.W.2d 133, 139 n. 4 (1977). A symbol written "with the intent that it be tantamount to a written signature, is a sufficient subscription." *See Radke v. Brenon,* 271 Minn. 35, 39, 134 N.W.2d 887, 891 (1965) (concluding that a typewritten name at the bottom of a letter was a sufficient subscription).

Despite the undisputed fact that the bank did not hand-sign the July 18th agreement, the buyers present three arguments that the bank electronically subscribed to the agreement. None are persuasive.

■ First, the buyers appear to contend that the subscription requirement is not mandatory because the July 18th agreement "provided the certainty required under the" statute of frauds. The buyers cite *Doyle v. Wohlrabe* for the proposition that "a written contract for the conveyance of land, to satisfy the statute of frauds, need only provide that degree of certainty which is reasonably necessary to identify the parties, the land to be conveyed, and the terms and conditions of the promises made by the respective parties to each other." 243 Minn. 107, 110, 66 N.W.2d 757, 761 (1954). The buyers misread *Doyle*. This case did not address the subscription requirement but examined only "the particularity with which [a] property must be described" to satisfy the statute of frauds. *Id.* at 110, 66 N.W.2d at 761. Section 513.05's requirement that a writing be "subscribed by the party by whom the lease or sale is to be made" would be superfluous if it is not mandatory. *See Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000) (providing that "no word, phrase, or sentence should be deemed superfluous, void, or insignificant" in a statute).

■ Second, the buyers argue that "the fact that [the bank] offered to sell the [Properties] to [the buyers], which offer was accepted, is sufficient to establish a subscription under the" statute of frauds. This argument lacks merit because the statute of frauds would be superfluous if mere offer and acceptance were sufficient to create a valid contract for the sale of land.

■ Finally, the buyers contend that, under the UETA, an electronic signature may satisfy the statute of frauds and the bank electronically subscribed to the July 18th agreement. This argument presents a matter of first impression for this court.

We must construe and apply the UETA to "facilitate electronic transactions consistent with other applicable law." Minn. Stat. § 325L.06. With limited exceptions, the UETA "applies to electronic records and electronic signatures relating to a transaction." Minn.Stat. § 325L.03(a). "A transaction subject to [the UETA] is also subject to other applicable substantive law." *Id.* (d). A "transaction" is defined as "an action or set of actions occurring between two or more persons relating to the conduct of business, commercial, or governmental affairs." Minn.Stat. § 325L.02(p). "A record or signature may not be denied legal effect or enforceability solely because it is in electronic form." Minn.Stat. § 325L.07(a). "If a law requires a signature, an electronic signature satisfies the law." *Id.* (d).

The buyers and the bank do not dispute that an electronic signature may satisfy the statute of frauds. But they dispute the applicability of the UETA here because it "applies only to transactions between parties, each of which has agreed to conduct transactions by electronic means. Whether the parties agree to conduct transactions by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." Minn.Stat. § 325L.05(b). The buyers argue that "[t]he ongoing emails ... illustrate a pattern of consistent, electronic communications, and provide sufficient grounds to conclude [that the bank] consented to transact with [them] electronically."

■ But the buyers' application of the UETA is overly broad. The UETA pro-

vides that "[i]f a party agrees to conduct a transaction by electronic means, [the UETA] does not prohibit the party from refusing to conduct other transactions by electronic means." *Id.* (c). Each "transaction"—or an action or set of actions—must be examined individually to determine whether the parties have agreed to conduct that specific transaction by electronic means. *See id.* Accordingly, while contracting parties may agree to negotiate and form a contract by electronic means, doing so does not mean that they have also agreed to electronically subscribe to whatever agreement may result from their electronic negotiations.

Here, there was no express agreement between the buyers and the bank to electronically subscribe to the purported agreement. Moreover, their conduct does not evidence an implied agreement to do so. The buyers hand-signed the initial version of the purchase agreement that was first sent to the bank on July 13. The buyers also hand-signed the purported final agreement. Berg and Puklich both stated a desire for "execution" or "fully executed" copies. And Berg wanted " 'hard copies' signed." Significantly, after July 26—the date that the buyers claim that the bank had electronically signed the purported agreement—Puklich, in numerous e-mails, continued to ask the bank to sign the agreement and to have it sent back to him by e-mail or hard-copy mail. In fact, on July 28, Puklich specifically requested a scanned copy of the signed agreement to be return by e-mail, supporting that the buyers intended that the agreement be hand-signed. Based on these communications, we conclude that no reasonable fact-finder could determine

that the buyers and the bank intended to subscribe to the July 18th agreement by electronic means. *See Powell v. City of Newton,* 364 N.C. 562, 703 S.E.2d 723, 727–28 (2010) (applying North Carolina's UETA and concluding that the parties did not agree to the use of electronic signatures "[i]n light of the express indication by [one party] that [the other party] should sign and forward the [agreements]").[1]

The buyers rely on foreign and unpublished cases to argue that the buyers and the bank contemplated the use of electronic signatures. *See Int'l Casings Grp., Inc. v. Premium Standard Farms, Inc.,* 358 F.Supp.2d 863 (W.D.Mo.2005); *Crestwood Shops, L.L.C. v. Hilkene,* 197 S.W.3d 641 (Mo.Ct.App.2006); *Dalos v. Novaheadinc.,* 1 CA–CV 07–0459, 2008 WL 4182996 (Ariz. Ct.App. Mar. 18, 2008). This reliance is misplaced. In each of these cases, there was some evidence sufficient for the court to determine that the parties intended to transact electronically. *Int'l Casings,* 358 F.Supp.2d at 875 (e-mail exchange); *Crestwood Shops,* 197 S.W.3d at 653 (e-mail exchange); *Dalos,* 2008 WL 4182996, at *4 (stating that "it particularly would be anomalous to suggest that [the parties], employees of a software company, did not consent to using e-mail"). But in *Int'l Casings* and *Dalos,* the e-mail correspondence did not evidence the intent to hand-sign the agreement. 358 F.Supp.2d at 865–67, 875, 2008 WL 4182996, at *2. And in *Crestwood Shops,* "the parties communicated primarily through email" and "explicitly agreed to communicate only in writing." 197 S.W.3d at 653. In fact, the party denying that there was an agree-

---

1. *Powell* and other foreign authorities cited in this opinion are not binding on Minnesota courts. But Minnesota's UETA is phrased similarly to those in other jurisdictions, and "[l]aws uniform with those of other states

shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them." Minn.Stat. § 645.22 (2012).

ment to transact by electronic means "conveyed her offer to terminate the contract via email and stated that she could only be reached through the use of email." *Id.* Here, the record is devoid of evidence showing intent to transact electronically with respect to the subscription of the agreement.

■ Even if the buyers and the bank contemplated the use of electronic signatures and the UETA is applicable, the evidence must be sufficient to show that the bank electronically signed the purported agreement. Under the UETA, an "electronic signature" is "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Minn.Stat. § 325L.02(h). The buyers argue that the bank electronically signed the July 18th agreement in two e-mails: Nemec's July 19th e-mail to Puklich and Berg's July 26th e-mail to Puklich. The buyers contend that Nemec's e-mail header and signature block and Berg's signature block evidence their electronic signatures.

The buyers point to a number of foreign cases concluding that a typed name in an e-mail, an e-mail header, or an e-mail signature block constitutes an electronic signature. *See, e.g., Cloud Corp. v. Hasbro, Inc.,* 314 F.3d 289, 296 (7th Cir.2002) (typed name); *Williamson v. Bank of New York Mellon,* 947 F.Supp.2d 704, 710–11 (N.D.Tex.2013) (automatically generated signature block); *Int'l Casings,* 358 F.Supp.2d at 873 ("a header with the name of the sender," despite no typed name).

■ We agree with the buyers that a reasonable fact-finder could determine that the July 19th and 26th e-mails contain, respectively, Nemec and Berg's electronic signatures. But the mere existence of electronic signatures does not end our inquiry. We must determine whether an electronic signature is "attached to or logically associated with" the electronic record at issue. *See* Minn.Stat. § 325L.02(h). In other words, an electronic signature in an e-mail message does not necessarily evidence intent to electronically sign a document attached to the e-mail. So we turn to the relevant question: Could a reasonable fact-finder determine that Nemec and Berg, by electronically signing their e-mails, also electronically signed the July 18th agreement that was attached to the e-mails? On this record, we conclude that no reasonable fact-finder could determine that the bank electronically signed the July 18th agreement.

■ Whether a sender has electronically signed an attached document depends on the circumstances, including whether the attached document itself contains the sender's electronic signature and whether the attached document is intended to be a draft or final version.[2] Here, the attached agreement contained signature lines but lacked the bank's handwritten or typed electronic signature. Moreover, Nemec's July 19th e-mail stated to Puklich, "If you have not received it yet, here is the corrected offer that needs to be signed." Subsequently, Puklich e-mailed Berg and asked, "Can you confirm that the agree-

---

**2.** We are aware of one case in which a court has concluded that the inclusion of a draft letter as an e-mail attachment does not satisfy the signature requirement. *See Pepco Energy Servs., Inc. v. Stefan F. Geiringer,* No. CV07–4809 (WDW), 2009 WL 3644295, at *7 (E.D.N.Y. Oct. 30, 2009) (stating that the parties exchanged numerous e-mails referencing a draft letter), *adhered to on reconsideration,* 2010 WL 318284, at *2 (E.D.N.Y. Jan. 21, 2010) (concluding that there was "no evidence that [the sender] intended to sign [a] letter," where the attached draft letter contained "no defined signature line" but "merely [the sender's] typed name").

ments with [the bank] are satisfactory[?] If so, can you have your client sign and I will have my client sign[?]" This exchange evidences that neither party considered the agreement attached in Nemec's July 19th e-mail as a final version. Berg's July 26th e-mail asked Puklich, "Could you confirm that this *draft* is acceptable to your client?" (Emphasis added.) Berg's characterization of the attached agreement precludes any persuasive argument that the agreement attached in Berg's July 26th e-mail was a final version that was meant to be signed. Accordingly, we conclude that no reasonable fact-finder could determine that Nemec and Berg's electronic signatures are logically associated with the purported July 18th agreement attached to their e-mails. Although the evidence indicates that Nemec and Berg intended to electronically sign their e-mail messages, the evidence is insufficient to establish that they intended to electronically sign the e-mail attachment.

The buyers cite several foreign cases to support their argument that Nemec and Berg electronically signed the purported agreement. But we are not persuaded by them because none involved a scenario, as here, in which the allegedly signed record is wholly contained in the e-mail as an attachment. *See, e.g., Cloud Corp.*, 314 F.3d at 293 (e-mail message); *Int'l Casings*, 358 F.Supp.2d at 872 (document attached to e-mails and the contract terms resolved by the e-mail messages).

We conclude that the district court correctly determined that the UETA is inapplicable because no reasonable fact-finder could determine that the buyers and the bank agreed to use electronic signatures to subscribe to an e-mail attachment. Moreover, no reasonable fact-finder could determine that the bank electronically signed the July 18th agreement. The district court, therefore, correctly determined that

the purported agreement fails to satisfy the statute of frauds and granted summary judgment in favor of the bank.

## II.

■■■■ The buyers also argue that the district court erred in its determination on the issue of equitable estoppel. "The application of equitable estoppel is a question of fact unless only one inference can be drawn from the facts." *Rhee v. Golden Home Builders, Inc.*, 617 N.W.2d 618, 622 (Minn.App.2000). "[T]he doctrine of equitable estoppel may limit the application of the [s]tatute of [f]rauds." *Lunning v. Land O'Lakes*, 303 N.W.2d 452, 457 (Minn. 1980). "When an application of the [s]tatute will protect, rather than prevent, a fraud, equity requires that the doctrine of equitable estoppel be applied." *Id.* A party invoking equitable estoppel must establish: (1) conduct amounting to a representation or concealment of material facts that are (2) known to the party estopped and (3) unknown to the party claiming the benefit of the estoppel, and (4) the conduct is done with the intent or expectation that the party would act on it, and (5) the party does act on it (6) to his detriment. *Id.*

The buyers argue that the bank misrepresented to them "that the July 18th Purchase Agreement was 'being signed'" and that they "took steps in reliance on [the bank's] representations, including obtaining a commitment for financing for their purchase of the [Properties] and suspending efforts to acquire other properties in 2012." But the buyers fail to satisfy the elements of equitable estoppel.

First, no reasonable fact-finder could determine that the bank made misrepresentations to the buyers. Berg's August 2nd e-mail to Puklich stated, "Tim Nemec said that the purchase agreements are being signed by the bank." And the August 10th e-mail stated, "The last time I talked to

Tim Nemec at [the bank], the purchase agreements were being signed by someone at the bank's main office." So contrary to the buyers' assertion, Berg did not tell Puklich that the agreement was being signed. Rather, Berg relayed to Puklich that Nemec advised Berg that the agreement was being signed. Nothing in the record proves false that Nemec advised Berg about the status of obtaining the bank's signature. And even if Nemec had made a misrepresentation, it was made to Berg, not to the buyers.

Second, the alleged misrepresentation is not material. "A fact is material if it is germane to the unconscionable conduct alleged and works a prejudice to the party." *Id.* at 458. In *Lunning*, the supreme court concluded that "repeated statements, over a two month period[ ] that [a] contract was coming" and "that it was being sent" were not germane and prejudicial. *Id.* Here, the alleged misrepresentation that the July 18th agreement was "being signed" is akin to the nonmaterial representations in *Lunning*.

Third, even if there was a material misrepresentation, there is no genuine issue of material fact as to whether the buyers acted on the alleged misrepresentation to their detriment. The buyers claim that the alleged misrepresentation prompted them to obtain financing and suspend efforts to acquire other real estate. But the buyers took these steps after the purported agreement had been formed in mid-July, weeks before Berg made the alleged misrepresentations on August 2nd and 10th. Nothing in the record suggests that the buyers took further steps in reliance on Berg's August e-mails. Moreover, nothing in the record suggests that the buyers were harmed in any way by applying for financing.

Finally, even if the bank had made a material misrepresentation on which the buyers relied to their detriment, nothing in the record suggests that Berg had knowledge of the buyers' business plans and intended them to suspend efforts to acquire other real estate. For all of these reasons, we conclude that there are no genuine issues of material fact as to whether the bank misrepresented a material fact on which the buyers relied to their detriment. The district court, therefore, correctly applied the statute of frauds.

### DECISION

Based on the e-mails exchanged between the buyers and the bank, no reasonable fact-finder could determine that the buyers and the bank agreed to electronically subscribe to the purported agreement and that the bank electronically subscribed to the agreement attached to the e-mails. And no reasonable fact-finder could conclude that the bank misrepresented a material fact on which the buyers relied to their detriment. The district court, therefore, did not err by determining that the purported agreement fails to satisfy the statute of frauds. For these reasons, the district court did not err by granting summary judgment in favor of the bank.

**Affirmed.**